704 So.2d 1161 (1997)
Silmon O. SEAL
v.
GAYLORD CONTAINER CORPORATION.
No. 97-C-0688.
Supreme Court of Louisiana.
December 2, 1997.
Dissenting Opinion December 12, 1997.
Rehearing Denied January 9, 1998.
*1162 Richard L. Ducote, New Orleans, for applicant.
Kirk Lindsay Landry, Keogh, Cox & Wilson, Baton Rouge, for respondent.
Dissenting Opinion of Judge Victory December 12, 1997.
CALOGERO, Chief Justice.
In this workers' compensation case, the hearing officer awarded the claimant supplemental earnings benefits, finding that the claimant had contracted an occupational disease that prevented him from earning ninety percent (90%) or more of his pre-injury wages. The hearing officer also awarded the claimant penalties, interest, and attorney fees, finding that the employer's failure to pay compensation was arbitrary and capricious. Although the court of appeal upheld the hearing officer's finding that claimant suffered an occupational disease, the court *1163 reversed the hearing officer's finding that the claimant carried his initial burden of proving his inability to earn ninety percent (90%) of his pre-injury wages by a preponderance of the evidence. We granted claimant's writ to determine whether the court of appeal erred in concluding that the hearing officer's findings were manifestly erroneous on the issue of claimant's entitlement to supplemental earnings benefits. For the reasons that follow, we reverse the court of appeal, amend the hearing officer's judgment, and affirm as amended.

FACTS & PROCEDURAL HISTORY
On May 27, 1957, the claimant, Silmon Seal, at twenty years of age, began working for defendant, Gaylord Container Corporation, in Bogalusa, Louisiana and worked there continuously for thirty-seven years. From 1979 until 1994, Seal worked as a "bogol operator" at Gaylord's paper mill. A bogol operator's duties include mixing various chemicals, such as sulfuric acid and "black liquor," and then "cooking" this mixture with the application of steam. This cooking process, which is performed indoors in an enclosed area, causes the emission of noxious fumes, including the release of hydrogen sulfide fumes. Seal testified that the fumes were often so powerful in the cooking area that they once caused him to lose consciousness and often required him to leave the building to catch his breath. Another bogol operator testified that, on occasion, the release of these fumes was so strong that it caused temporary shutdowns of the entire mill.
Sometime between 1986 and 1987, Seal developed a chronic cough, shortness of breath, and other related symptoms. These symptoms worsened progressively over time. As a result of these symptoms, Seal stopped working at the mill on August 1, 1994. The following month, he was referred to Dr. Henry Jackson, a board certified physician in the fields of internal medicine and pulmonary diseases, for treatment of his complaints. Under Dr. Jackson's care, Seal underwent a bronchoscope, which revealed severely inflamed airways. Dr. Jackson characterized the inflammation as "very striking" and likened it to that normally found in heavy smokers, but noted that Seal was (and has always been) a non-smoker. Based on these findings, Dr. Jackson diagnosed Seal as having "very severe bronchitis" and opined that this bronchial inflammation was caused by Seal's prolonged, heavy exposure to the chemical fumes at the paper mill.
Dr. Jackson advised Seal that it would be injurious to him were he to return to work in an environment that contained noxious fumes. Dr. Jackson notified Gaylord's workers' compensation insurer of this permanent work restriction in a December 31, 1994 letter. Following Dr. Jackson's instructions, Seal never returned to work at the mill. By mid-1995, Seal's condition had improved considerably to that of "a relatively healthy man." Nonetheless, in a letter to counsel dated June 30, 1995, Dr. Jackson reiterated that Seal should not return to work as a bogol operator, stating: "In my opinion, [Seal] is absolutely unable to work around noxious fumes, which clearly will cause recurrence of his bronchitis."
In March 1995, Seal filed a disputed claim for compensation benefits, alleging that prolonged exposure to chemical fumes at the workplace had caused severe lung damage and that Gaylord had refused to pay benefits after being notified of his condition. The matter came to trial before a workers' compensation hearing officer on October 5, 1995. On November 27, 1995, the hearing officer issued a judgment in favor of Seal, awarding him supplemental earnings benefits of up to 520 weeks beginning August 1, 1994, with a credit for any payments made by Gaylord's insurer, and further awarding him penalties, interest, and attorney fees of $4,500.00 for Gaylord's arbitrary and capricious handling of the claim.
Gaylord appealed the decision of the hearing officer, raising three assignments of error: (1) that the hearing officer committed legal error in determining that Seal sustained an occupational disease within the meaning of LSA-R.S. 23:1031.1, (2) that the hearing officer committed legal error in determining that Seal was entitled to supplemental earnings benefits pursuant to LSA-R.S. 23:1221(3), and (3) that the hearing officer *1164 committed manifest error in determining that Gaylord had acted arbitrarily and capriciously in the handling of the claim so as to support an award of penalties, interest, and attorney fees.
On the first assignment of error, the court of appeal upheld the hearing officer's finding that Seal had contracted an occupational disease, explaining that "[a]fter a thorough review and evaluation of the record, and primarily based upon the testimony of Seal, Seal's co-workers, and Dr. Jackson, we cannot say the that hearing officer's conclusion that Seal suffered from an occupation disease is clearly wrong or manifestly erroneous." Seal v. Gaylord Container Corp., 96-0349, pp. 4-5 (La.App. 1 st Cir. 2/14/97), 691 So.2d 114, 117. However, on the second assignment of error, the court of appeal reversed the hearing officer's finding that Seal was entitled to receive supplemental earnings benefits. The court reasoned that there was insufficient evidence in the record to establish Seal's alleged inability to earn ninety percent (90%) of his pre-injury wages. Id. at p. 6, 691 So.2d at 117-118. In so concluding, the court of appeal focused exclusively on Seal's testimony that he had "looked around for a job," but did not apply for work anywhere because most of the jobs that were available paid only minimum wagea far cry from the $17.36 per hour that Seal received as a bogol operator. On the third and final assignment of error, the court also reversed the hearing officer's granting of penalties, interest, and attorney fees. Id. at p. 7, 691 So.2d at 118.
Seal sought this Court's review of the court of appeal's judgment. As noted above, we granted certiorari to determine whether the court of appeal erred in concluding that the hearing officer's findings were manifestly erroneous on the issue of claimant's entitlement to supplemental earnings benefits.

DISCUSSION
Factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. Banks v. Industrial Roofing & Sheet Metal Works, 96-2840, p. 7 (La.7/1/97), 696 So.2d 551, 556; Smith v. Louisiana Dep't of Corrections, 93-1305, p. 4 (La.2/28/94), 633 So.2d 129, 132; Freeman v. Poulan/Weed Eater, 93-1530, pp. 4-5 (La.1/14/94), 630 So.2d 733, 737-38. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Banks, 96-2840 at pp. 7-8, 696 So.2d at 556; Freeman, 93-1530 at p. 5, 630 So.2d at 737-38; Stobart v. State, 617 So.2d 880, 882 (La. 1993). Where there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong. Banks, 96-2840 at p. 8, 696 So.2d at 556; Stobart, 617 So.2d at 882. "Thus, `if the [factfinder's] findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" Banks, 96-2840 at p. 8, 696 So.2d at 556 (quoting Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1112 (La.1990)).

Occupational Disease
In the instant case, the hearing officer found that Seal met his burden of proving that he had contracted an occupational disease. Seal v. Gaylord Container Corp., 95-01701 (District 6 11/27/95) (reasons for judgment). The court of appeal concluded that this finding was supported by sufficient evidence in the record and, thus, was not manifestly erroneous. Seal, 96-0349 at pp. 4-5, 691 So.2d at 117. For the reasons that follow, we agree with the lower courts, finding that Seal established the existence of an occupational disease by a reasonable probability.
LSA-R.S. 23:1031.1(A) entitles every employee who is disabled because of the contraction of an occupational disease to receive compensation benefits, provided that the employee's illness arises out of and in the course and scope of his employment. LA. REV.STAT. ANN. 23:1031.1(A) (West 1985). LSA-R.S. 23:1031.1(B) defines an "occupational disease" as "that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular *1165 trade, occupation, process, or employment in which the employee is exposed to such a disease." LA.REV.STAT. ANN. 23:1031.1(B) (West Supp.1997). This causal link between the employee's illness and work-related duties must be established by a reasonable probability. Coats v. American Tel. & Tel. Co., 95-2670, p. 7 (La.10/25/96), 681 So.2d 1243, 1247. Once the employee has established the existence of an occupational disease, for his illness to be compensable, the employee must further establish that the illness is disabling. Id. (citing Miller v. Roger Miller Sand, Inc., 94-1151 (La.11/30/94), 646 So.2d 330). In other words, after the employee has established the existence of an occupational disease, then he must further establish that he meets the criteria for one or more of the statutory disabilities, that is (1) temporary total disability, (2) permanent total disability, (3) supplemental earnings benefits, or (4) permanent partial disability. See LA.REV.STAT. ANN. 23:1221 (West 1985 & Supp.1997).
In the case under consideration, the record contains ample evidence to support the hearing officer's finding that Seal's illness arose out of and in the course and scope of his employment. The most compelling evidence in this regard is found in the deposition testimony of Dr. Jackson, Seal's treating physician. After ruling out other causes for Seal's very severe bronchial inflammation, such as asthma, allergic disease, or smoking, Dr. Jackson concluded that his illness was caused by Seal's prolonged, heavy exposure to chemical fumes at the paper mill. Dr. Jackson's conclusion is bolstered by the fact that Seal's physical condition improved dramatically after he ceased working in that environment. In addition to Dr. Jackson's testimony, Seal and two of his former co-workers testified as to the effect of the fumes upon Seal. The testimony related that, when exposed to the fumes, Seal would often cough to the point of losing his breath, causing him to expel a yellow mucus and requiring him to leave the building, and that, on one occasion, the fumes caused him to lose consciousness. We conclude that this record evidence is sufficient to support the hearing officer's finding that Seal had contracted an occupational disease. We must now determine whether there exists sufficient evidence in the record to establish that Seal's occupational disease caused him to suffer a statutory disability.[1]

Supplemental Earnings Benefits
After finding that Seal had contracted an occupational disease that was not total and permanent, the hearing officer awarded Seal supplemental earnings benefits (SEBs) for up to 520 weeks, retroactive to August 1, 1994 in an amount based upon the difference between average monthly wages for a position paying minimum wage and the average monthly wages that Seal earned as a bogol operator. Seal, 95-01701 (reasons for judgment). The court of appeal reversed on this issue, finding insufficient evidence in the record to establish Seal's alleged inability to earn ninety percent (90%) of his pre-injury wages. Seal, 96-0349 at p. 6, 691 So.2d at 117. For the reasons that follow, we conclude that the court of appeal erred in reversing the hearing officer's findings on this issue.
*1166 Under the provisions of LSA-R.S. 23:1221(3)(a), an employee is entitled to receive SEBs if he sustains a work-related injury that results in his inability to earn ninety percent (90%) or more of his average pre-injury wage. LA.REV.STAT. ANN. 23:1221(3)(a) (West Supp.1997). Initially, the employee bears the burden of proving, by a preponderance of the evidence, that the injury resulted in his inability to earn that amount under the facts and circumstances of the individual case. Freeman, 93-1530 at p. 7, 630 So.2d at 739. "Th[is] analysis is necessarily a facts and circumstances one in which the court is mindful of the jurisprudential tenet that workers' compensation is to be liberally construed in favor of coverage." Daigle v. Sherwin-Williams Co., 545 So.2d 1005, 1007 (La.1989).
Once the employee's burden is met, the burden shifts to the employer who, in order to defeat the employee's claim for SEBs or establish the employee's earning capacity, must prove, by a preponderance of the evidence, that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer's community or reasonable geographic region. LA.REV.STAT. ANN. 23:1221(3)(c)(i) (West Supp.1997); Daigle, 545 So.2d at 1009. Actual job placement is not required. Banks, 96-2840 at p. 9, 696 So.2d at 556. The amount of an award of SEBs is based upon the difference between the claimant's pre-injury average monthly wage and the claimant's proven post-injury monthly earning capacity. LA REV. STAT. ANN. 23:1221(3)(a) (West Supp.1997).
In determining whether a hearing officer's finding that an employee has met his initial burden of proving entitlement to SEBs is manifestly erroneous, a reviewing court must examine the record for all evidence that bears upon the employee's inability to earn 90% or more of his pre-injury wages. Pinkins v. Cardinal Wholesale Supply, 619 So.2d 52, 56 (La.1993) ("Our courts should look to the totality of factors related to a realistic appraisal of access to employment."). In the instant case, we find that the court of appeal erred in narrowing its review of this issue to Seal's testimony that although he had searched for a job, he did not apply for work anywhere because most of the jobs that were available paid only minimum wage, which was only one-third of the amount that he had earned as a bogol operator. Seal, 96-0349 at p. 6, 691 So.2d at 117-118. Judge Carter, in dissent, properly conducted a review of all the relevant evidence in the record, summarizing the supporting evidence as follows:
The medical and lay testimony presented at the hearing established that Seal suffered from an occupational disease which prevented him from returning to his $17.36 an hour job as a bogol operator at Gaylord.... Seal testified that he ha[d] a high school diploma and began working at the Gaylord facility when he was twenty years old. At the time of the hearing, Seal was fifty-eight years old and had been employed at the facility for more than thirty-eight years, the last fifteen of which had been as a bogol operator. This testimony establishes that Seal has spent his entire work life at his job at the paper mill and has no other discernible skills to utilize to earn a living. Seal testified that he left his employment with Gaylord in 1994 because of his severe bronchial condition. The medical testimony corroborated Seal's testimony. Clearly, Seal cannot earn his pre-injury wages because he cannot return to his job and because he had no skills other than that of a paper mill worker. Seal testified that he looked for alternative work but was unable to find a job which paid more than minimum wage. Seal acknowledged that "[i]t looks like I'm going to have to go to that."
Seal, 96-0349 at p. 3, 691 So.2d at 120 (Carter, J. dissenting). Considering the tenet requiring liberal construction in favor of workers' compensation coverage, Judge Carter concluded that the above-quoted evidence is sufficient to establish Seal's initial burden of proving that he is unable to earn 90% of his pre-injury wages. Id. We agree.
The medical and lay testimony established that Seal could not return to his former job as a bogol operatora job at which he was able to earn $17.36 per hour, more than three *1167 times the minimum wage. In his testimony, Seal concedes that he is able to earn minimum wage, and the hearing officer's award of SEBs reflects this concession. In addition, we find that Seal's age, limited education, and specialized work history are additional factors that mitigate in favor of the hearing officer's conclusion that Seal is unable to earn ninety percent (90%) or more of his pre-injury wages. Thus, we conclude that because there was sufficient evidence in the record, the court of appeal erred its determination that the hearing officer's findings on this issue were manifestly erroneous.
Having concluded that Seal satisfied his initial burden of proving entitlement to SEBs, we now consider whether Gaylord carried its burden of proving that there were jobs available to Seal within his work restriction and geographic region that would enable him to earn ninety percent (90%) or more of his pre-injury wages.
In Banks v. Industrial Roofing & Sheet Metal Works, this Court set forth a minimum standard that an employer must meet in order to defeat an employee's claim for SEBs by proving job availability. 96-2840, pp. 10-11 (La.7/1/97), 696 So.2d 551, 557. To prove job availability, an employer must establish, by competent evidence, the following:
(1) the existence of a suitable job within claimant's physical capabilities and within claimant's or the employer's community or reasonable geographic region;
(2) the amount of wages that an employee with claimant's experience and training can be expected to earn in that job; and
(3) an actual position available for that particular job at the time that the claimant received notification of the job's existence.
Id. Applying this minimum standard to this case, we conclude that the hearing officer was not manifestly erroneous or clearly wrong in finding that Gaylord failed to present sufficient competent evidence to carry its burden.
The only evidence that Gaylord presented to establish job availability was the testimony of B.H. Barker, its human resource supervisor. At first, Barker opined that there were several jobs that were available to Seal at the mill, which would not involve working directly around sulfuric acid fumes. However, on cross examination, Barker conceded that these jobs might not be appropriate for Seal, considering that there is exposure to some extent everywhere around the mill.[2] Even assuming that there were jobs available at the mill that would not expose Seal to chemical fumes, Barker's testimony did not establish that any of these jobs would pay ninety percent (90%) or more of Seal's pre-injury wage. Barker testified that the range of salaries for the available jobs went from a low of $10.21 to a high of $10.61 per hour with the potential to eventually progress to the $16.00 to $17.00 per hour range. Barker gave absolutely no indication of how long this progression would take. As noted above, Seal had been earning $17.36 per hour as a bogol operator. The most compelling shortfall in Gaylord's evidence, however, is that no one at the mill notified Seal or his counsel that there were any jobs available within Seal's work restrictionthat is, work that did not involve exposure to chemical fumes. Barker explained that Gaylord was unable to offer Seal another position because a provision in a labor agreement required that all available positions be posted for employees to bid on. However, Barker did not identify any provision in the labor agreement that would have prevented Gaylord from notifying Seal or his counsel of the existence of suitable jobs that were available for Seal to bid upon. Considering the above, we conclude that Barker's generalized testimony, concerning the posting of "some" available jobs that might fall within Seal's work restriction with starting wages far below ninety *1168 percent (90%) of Seal's pre-injury wage falls short of the minimum standard of proof required in Banks. For these reasons, we find that the hearing officer correctly concluded that Seal was entitled to an award of SEBs for up to 520 weeks, retroactive to August 1, 1994 in an amount based upon the difference between average monthly wages for a position paying minimum wage and the average monthly wages that Seal earned as a bogol operator.

Attorney Fees & Penalties
We now address the issue of whether Seal is entitled to recover attorney fees and penalties. For the reasons that follow, we find that the hearing officer's award of attorney fees and penalties is unsupported under the facts presented in this difficult case.
LSA-R.S. 23:1201(F) provides the basis for an award of attorney fees and penalties. LA. REV.STAT. ANN. 23:1201(F) (West Supp.1997). This provision, however, is inapplicable if the claim is reasonably controverted. Id. 1201(F)(1). As discussed above, Gaylord contested Seal's claim for benefits based upon its belief that, under this Court's decision in Parks v. Insurance Co. of North America, 340 So.2d 276 (La.1976), Seal was not disabled. See supra note 1 (distinguishing Parks from the case before us). Although we ultimately concluded that Gaylord's argument on this point lacked merit, we cannot say that Gaylord's refusal to pay benefits based upon its belief that Parks was applicable was arbitrary and capricious. Thus, we find that the hearing officer's award of attorney fees and penalties to have been clearly wrong.

DECREE
For the foregoing reasons, we reverse the judgment of the court of appeal. Further, we amend the judgment of the hearing officer to strike the award for attorney fees and penalties and reinstate the hearing officer's judgment as so amended.
REVERSED; HEARING OFFICER'S JUDGMENT REINSTATED AS AMENDED.
KNOLL, J., concurs in part and dissents in part and assigns reasons.
VICTORY, J., dissents in part and assigns reasons.
TRAYLOR, J., not on panel. Rule IV, Part 2, § 3.
KNOLL, Justice, concurring in part and dissenting in part.
I agree with the majority determination that the hearing officer correctly found that Seal had contracted an occupational disease and that he was entitled to an award of SEB's. However, I dissent from the majority's conclusion that the hearing officer was manifestly erroneous in awarding Seal penalties and attorneys fees. The findings of the hearing officer, which are entitled to great deference, are clearly supported by the record evidence and not manifestly erroneous. The majority opinion errs in substituting its own findings of fact for the equally reasonable findings of the hearing officer.
In my view, this hard working and faithful employee, who was fifty-seven (57) years of age when he was forced to stop working at the mill, clearly proved the defendant's arbitrary and capricious conduct. The medical evidence was clear and unequivocal: Seal's medical condition was caused solely by his employment as a bogol operator and would reoccur if he returned to work around noxious fumes. Despite the undisputed medical recommendation of Seal's treating physician, the only position shown to be available by the employer was at the plant where Seal would again be exposed to noxious fumes. The position offered by the defendant does not support its assertion of job availability. To the contrary, it illustrates the employer's arbitrary disregard of Seal's medical condition and its capricious refusal to pay Seal's claim for SEB's.
This case demonstrates a classic case of arbitrary and capricious conduct on the part of the employer. We should discourage this type of conduct by reinstating the hearing officer's findings of arbitrary and capricious conduct and by reinstating the reasonable award of penalties and attorney's fees.
*1169 VICTORY, Justice, dissenting.
In my view the majority erred in finding that Seal met his initial burden of proof and that Gaylord did not meet its burden of proof.

I. Employee's burden of proof
To recover supplemental earnings benefits the initial burden of proof is on the employee, who must prove by a preponderance of the evidence that he is unable to earn wages equal to ninety percent or more of what he earned before the accident. Daugherty v. Domino's Pizza, 95-1394 (La.5/21/96), 674 So.2d 947; Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129. Only when this burden is met does the burden shift to the employer to show, if he wishes to contend that the employee is earning less than he is able to earn so as to defeat or reduce supplemental earnings benefits, that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer's community or reasonable geographic region. Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28.94), 633 So.2d 129. The burden does not shift to the employer merely because an employee proves he is unemployed at the time of trial. To find otherwise "would provide a claimant with a strong incentive to remain unnecessarily unemployed." Smith v. Hamp Enterprises, Inc., 95-2343, p. 4 (La.App. 4th Cir.1996), 673 So.2d 267, 270. Additionally, the "more obviously and severely disabling an injury is, the less extrinsic evidence should be required to establish an initial prima facie case of entitlement to Supplemental Earnings Benefits." Id.
The following testimony is the total offered by Seal to prove his inability to obtain ninety percent of his pre-injury wages:
Q. Mr. Seal, you haven't worked since August of 1994; is that correct?
A. Right.
Q. Have you applied for work anywhere since then?
A. No, sir. I looked around for a job. Most of them that I could get was paying minimum wages and that wasn't near enough, you know. It looks like I'm going to have to go to that.
* * * * * *
Q. Have you asked anyone at Gaylord Container Corporation if you could work there?
A. No, sir. I figured they'd contact [his attorney] being I had to hire him, you know.
* * * * * *
Q. No one at Gaylord Container Corporation has refused you employment; is that correct?
* * * * * *
A. No, sir, they haven't.
[emphasis added]
This evidence is clearly inadequate for Seal to meet his burden of proving his inability to earn ninety percent of his pre-injury wages. Seal did not apply for any employment after he stopped working in the bogol plant in August of 1994. This is despite the fact that, absent a return to his old job in the bogol plant, Seal was characterized by his own physician as "a relatively healthy man" as early as mid-1995. See Majority Opinion at 1163. This case is similar to Smith v. Hamp Enterprises, Inc., supra. In both cases the employees made no real effort to find other employment, and the employees could have worked in many other jobs given the few restrictions their injuries placed upon them. In Smith, the Fourth Circuit found that such an employee did not meet his burden of proving his inability to earn ninety percent of his pre-injury wages. Here, the plaintiff's only restriction is that he should not work around sulfuric acid fumes at the bogol plant due to probable recurrence with his respiratory condition. He is not disabled from any other job, and acknowledged "most" of the jobs he looked at were minimum wage jobs, clearly indicating some were more than minimum wage. Yet he did not name any jobs he sought, nor did he name a single employer he visited. Surely the plaintiff has to offer more than his unsupported conclusion that he is unable to earn ninety *1170 percent of his prior wage in order to carry his burden of proof.
Further, by focusing on factors such as his high school education and limited experience in awarding plaintiff supplemental earnings benefits, the majority ignores the clear language in LSA-RS 23:1221(3)(a), the statute creating the entitlement to supplemental earnings benefits:
For injury resulting in the employee's inability to earn wages equal to ninety per cent or more of wages at time of injury, supplemental earnings benefits equal to seventy-four percent of the difference between ninety percent of the average monthly wages at time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience, such comparison to be made on a monthly basis.
[emphasis added]
The meaning of this statute is clear. Supplemental earnings benefits are available only to those employees who are unable to earn their pre-injury wages because of their physical disability, exclusive of factors such as education, training and experience.

II. Employer's burden of proof
Even assuming that Seal met his burden of proof, the majority erred in concluding that Gaylord did not meet its burden of proving that work was available to the plaintiff at the Gaylord facility.
Seal's own testimony shows that he was able to work in other parts of the mill. The following exchange took place between Gaylord's attorney and Seal at Seal's worker's compensation hearing:
Q. Has Dr. Jackson advised you that you're not able to work at Gaylord Container Corporation in any other area other than the bogal plant?
A. No, sir, he didn't say that.
Not only was Seal not medically restricted from working at other parts of the plant, he also contemplated working for Gaylord in other parts of the mill but made no effort to obtain a job there. Quoted below is another exchange at the hearing between Seal and Gaylord's attorney:
Q. Have you asked anyone at Gaylord Container Corporation if you could work there?
A. No, sir. I figured they'd contact [his attorney] being I had to hire him, you know.
Note that Seal did not say that he did not contact Gaylord because he was physically unable to work there. Instead, he says he did not contact them because he thought that Gaylord would contact him about employment. Nothing prevented Seal from working in other parts of the mill. Thus, Gaylord, through B.H. Barker's testimony, established the existence of jobs in other parts of the mill which did not involve direct exposure to sulfuric fumes.[1] These jobs started at $10.21 to $10.61 per hour, with the potential to eventually increase to $16.00 to $17.00 per hour. Majority Opinion at 1167.
The employer's burden of proof in supplemental earnings benefits cases is not merely designed to allow him to defeat completely the payment of benefits. It also allows him to reduce the amount of payments to employees entitled to such benefits. This is especially true where an able-bodied employee has an available job where he could make twice the minimum wage, even if these wages are not equal to ninety percent of the employee's pre-injury wages. In this case, B.H. Barker testified that the jobs available at the mill (away from any fumes) had a starting salary of $10.21 to $10.61 per hour. Seal was not medically restricted from performing these jobs. Yet the majority bases its award *1171 of benefits to Seal on the difference between his prior salary and minimum wage. I cannot agree with such an award under these facts. Gaylord clearly has shown that jobs are available at its mill which Seal can perform starting at $10.21 per hour. At the least, any award to Seal should be based upon the difference between Seal's prior salary and $10.21 per hour.
Yet the majority finds that the "most compelling shortfall" in Gaylord's attempt to meet its burden of proof was its failure to notify Seal or his counsel that there were any jobs available with Seal's work restrictions. I cannot agree. The plaintiff knew his job restrictions were minimal and knew, as a thirty-eight year union employee at Gaylord's plant, that numerous jobs were available he could perform at Gaylord that he could have bid on, and would have obtained due to his seniority at the mill. Yet he made no effort to obtain employment there. Of course, now he has little incentive to work at Gaylord or anywhere else. Supplemental earnings benefits were intended to help replace the loss of ability to earn prior wages, not to provide a retirement for a healthy worker who can do any job he could do prior to his injury but for working in the bogol plant at the Gaylord mill. I respectfully dissent.
NOTES
[1] Gaylord urged in brief and at oral arguments that, under this Court's decision in Parks v. Insurance Co. of North America, 340 So.2d 276 (La.1976), Seal is not disabled. We disagree. The Parks case involved a plaintiff who sustained a work-related accident when she inhaled fabric lint at a garment factory, which aggravated her predisposition toward respiratory difficulties and which contributed to her contracting acute bronchitis. Plaintiff never returned to work in the garment factory, and, eventually, she fully recovered from her injuries. Notwithstanding that her physician advised her not to return to work in the factory, this Court held that plaintiff was not totally and permanently disabled. Id at 282. We find the Parks case to be distinguishable from this case in several respects. First, the Parks plaintiff was seeking total and permanent disability benefits, whereas Seal is seeking only supplemental earnings benefits for loss of earning capacity. Second, the testimony established that the Parks plaintiff was predisposed to respiratory difficulties, whereas the testimony in the instant case shows that Seal had enjoyed perfect health prior to his employment as a bogol operator. Finally, the evidence in the Parks case suggested other possible causes for plaintiff's respiratory ailments, such as her smoking, whereas the medical and lay testimony in the case before us reveals no other cause for Seal's illness. For these reasons, we find the Parks case to be inapplicable to the instant case.
[2] Note the following colloquy between plaintiff's counsel and Barker on cross examination:

Q.... And youlike you said, you're not aware of the restrictions put on by Dr. Jackson so you can't say that Mr. Seal can do any jobs at that paper mill given the fact that there is exposure to some extent everywhere around that mill.
A. I cannot truthfully testify to that.
[1] Barker testified that under the labor agreement between Gaylord and its employees, available jobs are bid on by the employees. He testified that these jobs are awarded on the basis of seniority. Given that Seal had worked at Gaylord for 37 years, undoubtedly he would have been hired for any job which he bid upon.