# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 04-431

**DALLAS MAYNARD**

**VERSUS**

**GREY WOLF DRILLING**

**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 4
PARISH OF ACADIA, NO. 01-01697
SHARON MORROW, WORKERS' COMPENSATION JUDGE

**********

**MARC T. AMY**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, Marc T. Amy, and John B. Scofield*, Judges.

**AFFIRMED. ADDITIONAL ATTORNEY'S FEES AWARDED.**

Frank A. Flynn
Allen & Gooch
Post Office Drawer 3768
Lafayette, LA 70502-3768
(337) 291-1250
COUNSEL FOR DEFENDANT/APPELLANT:
    Grey Wolf Drilling

Michael Benny Miller
Miller & Miller
Post Office Box 1630
Crowley, LA 70527-1630
(337) 785-9500
COUNSEL FOR PLAINTIFF/APPELLEE:
    Dallas Maynard

Patrick J. Hanna
Rabalais, Hanna & Hebert
701 Robley Drive, Suite 210
Lafayette, LA 70503
(337) 981-0309
COUNSEL FOR:
    Work Enterprises, Inc., appearing as Amicus Curiae

* John B. Scofield participated in this decision by appointment of the
Louisiana Supreme Court as Judge Pro Tempore

AMY, Judge.

The claimant filed a disputed compensation form alleging that his workers' compensation indemnity benefits were impermissibly reduced from those for temporary total disability to supplemental earnings benefits. He contends that the position relied upon by the employer for doing so was not appropriate employment under the indemnity benefits statute. The workers' compensation judge found in favor of the claimant, returning him to temporary total disability status. Penalties and attorney's fees were awarded for unrelated payment issues. The employer appeals. For the following reasons, the decision of the workers' compensation judge is affirmed. Additional attorney's fees are awarded for work performed on appeal.

**Factual and Procedural Background**

The claimant, Dallas Maynard, began receiving workers' compensation benefits following a March 10, 1994 work-related accident while an employee of Grey Wolf Drilling Company. Mr. Maynard's injuries resulted from having sustained an electrical shock while working as a derrick hand with the employer. Subsequent to the accident, Mr. Maynard's course of treatment included an L5/S1 fusion in 1995 and, due to ongoing headaches, an occipital neurectomy in 1996. He has allegedly been left with neck and back pain and, in his disputed claim form, complains of undisclosed injuries to the brain. Entered into evidence at the trial on the matter were the depositions and records of Dr. John Martin, a pain management specialist, and Dr. James Blackburn, a psychiatrist. Mr. Maynard continued to receive treatment from both physicians at the time of their depositions. The record indicates that Mr. Maynard continued to take a myriad of medications for pain and anxiety. He further continued in his use of an implanted spinal cord stimulator to control his back pain, a practice Dr. Martin opined would likely continue for the remainder of his life.

The instant matter arose in 2001, when the employer's insurer, Gray Insurance Company, contracted with Work Enterprises, Inc. (hereinafter WE), to offer a period of training and possibly a subsequent offer of employment to the claimant. The record reflects that WE is a for-profit company which offers generally home-bound employment to those who are disabled. According to Stanford McNabb, who described himself as a stockholder in the business and who explained that he performs management and marketing functions with the company, WE offers a period of training to employers and insurers for their disabled workers and perhaps, ultimately, a job offer.

The initial ten month period of the position, described in the record as a training period, offers homebound work tailored to meet an employee's individual disabilities. During the initial period, there is no quota in the production of the company's products, *i.e.*, candles, bath salts, Mardi Gras confetti, etc. While performing these tasks, the employee is assured thirty hours per week of work, earning $5.15 per hour. WE provides the employee's workers' compensation coverage and Social Security payments. The position with WE is subsidized by several payments from the employer, totaling $13,000. These payments will be detailed in our discussion below.

In the present case, the claimant's indemnity benefits were reduced to Supplemental Earnings Benefits (SEBs) after the offer of the position in the paid training program was refused by the claimant. The claimant filed the disputed claim form instituting this matter in March 2001. He sought a return to full indemnity benefits along with penalties and attorney's fees.

Following a hearing, the workers' compensation judge found in favor of the

2

claimant, returning Mr. Maynard to full indemnity benefits. In oral reasons for ruling, the workers' compensation judge concluded that the position offered by WE was not "employment" sufficient to serve as a basis for reduction of benefits. Penalties in the amount of $6,000 and attorney's fees in the amount of $12,000 were also awarded.

The employer[1] appeals, assigning the following as error:

> Assignment of Error I
>
> The trial court committed manifest error when it failed to find the plaintiff/appellee was capable of employment under La.R.S. 23:1221(1)(c) and 23:1221(3)(a) when, in fact, the trial record establishes a viable job offer was made by WE, Inc. within the appellee's treating physicians' restrictions.
>
> Assignment of Error II
>
> The trial court committed mainifest [sic] error when it failed to find the WE, Inc. employment constituted a reasonable placement of a substantially impaired employee, who had reached a medical plateau, into a viable employment opportunity pursuant to the guidelines of La.R.S. 23:1226 and La.R.S. 23:1221(3)(a).
>
> Assignment of Error III
>
> The trial court committed manifest error when it found the Gisclair Rehabilitation specialist's work constituted "sham rehabilitation" when her efforts, under the circumstances, were fully in accordance with the letter and spirit of the rehabilitation statute - La.R.S. 23:1226.
>
> Assignment of Error IV
>
> The trial court committed manifest error when it found the appellants, Grey Wolf Drilling Company and The Gray Insurance Company, were obligated to pay $6000 in penalties and $12000 in attorney fees when at all times Grey Wolf Drilling Company and the Gray Insurance Company acted reasonably in its handling of this case.

( Use of uppercase, underlined text omitted.)

WE, has filed an *amicus curiae* brief with this court, asserting that the workers' compensation judge's determination, if not reversed, will be detrimental to its program and its workers.

---

[1]Although both the employer and insurer are appellants, they will be referred to throughout this review as the "employer."

**Discussion**

*Classification of Benefits*

Discussing its first three assignments of error collectively, the employer contends that the workers' compensation judge erred in finding the use of the WE position to be an insufficient basis for reducing the benefits to those of SEBs. In particular, the employer points to the fact that a paying position was, in fact, offered to the claimant and, furthermore, the job descriptions were approved by the claimant's treating physicians. These factors, it contends, indicate that a reduction is required pursuant to the statutory requirements for temporary total disability benefits (hereinafter TTD benefits) and those for supplemental earnings benefits. The claimant contends the position offered is not employment, but merely a vehicle by which employers/insurers might reduce their workers' compensation liability exposure. The claimant points to the statutory limit on the length of availability of SEBs.

When a claimant not engaged in employment seeks to establish entitlement to temporary total benefits under La.R.S. 23:1221(1),[2] Subparagraph (C) of La.R.S.

---

[2]La.R.S. 23:1221(1) provides, in pertinent part:

**(1) Temporary total.**
(a) For any injury producing temporary total disability of an employee to engage in any self-employment or occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured, and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, or experience, sixty-six and two-thirds percent of wages during the period of such disability.
(b) For purposes of Subparagraph (1)(a) of this Paragraph, compensation for temporary disability shall not be awarded if the employee is engaged in any employment or self-employment regardless of the nature or character of the employment or self-employment including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in pain.
(c) For purposes of Subparagraph (1)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment as described in Subparagraph (1)(b) of this Paragraph, compensation for temporary total disability shall be awarded only if the employee proves by clear and convincing evidence,

4

23:1221(1) sets forth the burden of proof required of a claimant seeking to establish entitlement to TTD benefits, indicating that TTD benefits are appropriate where an employee "proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment . . . ."

With regard to SEBs, La.R.S. 23:1221(3)[3] sets forth a framework indicating

---

unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.

    (d) An award of benefits based on temporary total disability shall cease when the physical condition of the employee has resolved itself to the point that a reasonably reliable determination of the extent of disability of the employee may be made and the employee's physical condition has improved to the point that continued, regular treatment by a physician is not required.

[3]La.R.S. 23:1221(3) provides, in relevant part:

    **(3) Supplemental earnings benefits.**
    (a) For injury resulting in the employee's inability to earn wages equal to ninety percent or more of wages at time of injury, supplemental earnings benefits equal to sixty-six and two-thirds percent of the difference between the average monthly wages at time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience, such comparison to be made on a monthly basis . . . .

    (b) For purposes of Subparagraph (3)(a), of this Paragraph, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sums actually received by the employee, including, but not limited to, earnings from odd-lot employment, sheltered employment, and employment while working in any pain.

    (c)(i) Notwithstanding the provisions of Subparagraph (b) of this Paragraph, for purposes of Subparagraph (a) of this Paragraph, if the employee is not engaged in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, or is earning wages less than the employee is able to earn, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sum the employee would have earned in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, which he was physically able to perform, and (1) which he was offered or tendered by the employer or any other employer, or (2) which is proven available to the employee in the

that a claimant must first demonstrate by a preponderance of the evidence that he or she is unable to earn 90% of his or her pre-injury wage due to the work-related injury. *Seal v. Gaylord Container Corp.*, 97-0688 (La. 12/2/97), 704 So.2d 1161. If this initial burden is satisfied by the claimant, an employer attempting to defeat the claim for SEBs or establish the claimant's earning capacity, is required to prove, also by a preponderance of the evidence, "that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer's community or reasonable geographic region." *Id.* at 1166, citing La.R.S. 23:1221(3)(c)(i).

In oral reasons for ruling, the workers' compensation judge concluded that the position offered by WE could not be used by the employer to reduce Mr. Maynard's benefits to SEBs. She noted that, although La.R.S. 23:1221(1) focuses upon the claimant's ability to physically engage in any employment, the position offered by WE was not sufficient "employment" for TTD purposes.

employee's or employer's community or reasonable geographic region.

(ii) For purposes of Subsubparagraph (i) of this Subparagraph, if the employee establishes by clear and convincing evidence, unaided by any presumption of disability, that solely as a consequence of substantial pain, the employee cannot perform employment offered, tendered, or otherwise proven to be available to him, the employee shall be deemed incapable of performing such employment.

(d) The right to supplemental earnings benefits pursuant to this Paragraph shall in no event exceed a maximum of five hundred twenty weeks, but shall terminate:

(i) As of the end of any two-year period commencing after termination of temporary total disability, unless during such two-year period supplemental earnings benefits have been payable during at least thirteen consecutive weeks; or

(ii) After receipt of a maximum of five hundred twenty weeks of benefits, provided that for any week during which the employee is paid any compensation under this Paragraph, the employer shall be entitled to a reduction of one full week of compensation against the maximum number of weeks for which compensation is payable under this Paragraph; however, for any week during which the employee is paid no supplemental earnings benefits, the employer shall not be entitled to a reduction against the maximum number of weeks payable under this Paragraph; or

(iii) When the employee retires; however, the period during which supplemental earnings benefits may be payable shall not be less than one hundred four weeks.

6

On appeal, a workers' compensation judge's factual determinations are subject to the manifest error or clearly wrong standard of review. *Banks v. Industrial Roofing & Sheet Metal Works, Inc.*, 96-2840 (La. 7/1/97), 696 So.2d 551. In its application of this standard, the reviewing court is not to consider whether the workers' compensation judge was correct or incorrect, but whether the determination was a reasonable one. *Id.* This determination must be made in light of the record as a whole. *Id.* Our review of the record reveals no such manifest error in the workers' compensation judge's determination that the reduction of indemnity benefits was improper.

First, the workers' compensation judge was made aware of the claimant's physical condition and the related hindrances to his ability to function in the workplace.[4] Dr. Martin, Mr. Maynard's treating physician in the field of pain management, explained in his deposition that he began treating Mr. Maynard for leg, back, and neck pain upon referral from an orthopedic surgeon. Dr. Martin reported that both objective and subjective findings led to nerve block injections and eventually, the implantation of a spinal stimulator. As of the date of his deposition, Mr. Maynard continued to treat with him and continued in his complaints and use of a number of medications. Dr. Martin reported that Mr. Maynard was periodically experiencing loss of consciousness, which led to a recommendation that he not continue to drive.

---

[4]In reasons for ruling, the workers' compensation judge referenced *Comeaux v. City of Crowley*, 01-0032 (La. 7/3/01), 793 So.2d 1215, a case in which the Louisiana Supreme Court considered what might constitute the phrase "physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment" as used in La.R.S. 23:1221(2), that portion of the statute relating to permanent total disability. In that case, the court considered not only a claimant's physical condition in deciding whether an injured worker was disabled, but also found that consideration of a claimant's ability or inability to be retrained/re-educated for future employment was appropriate.

7

Although Dr. Martin explained that he approved the job descriptions provided by WE, upon questioning by counsel for the employer/insurer, Dr. Martin further explained generally about Mr. Maynard's future in a work-place environment:

Q      And insofar as other work other than the jobs that you approved, do you think that there's potential for him to do more - - or other jobs in the sedentary-to-light-duty activities?

A      No. I think he's going to be chronically restricted to low-level-activity positions, and I think he's also going to be limited based on traveling potential. It's recommended by Dr. Domingue and myself that he not drive to work because of the blackout episodes that have happened in the past.

. . . .

Q      Now, assuming that he has some driving ability down the road, do you think that, from a pain management standpoint, that there would be an increased opportunity for other types of sedentary or light-duty employment for the patient?

A      Yes, but I think those are probably going to be evaluated individually for him and match - -

Q      The only jobs that you felt that he's presently capable of doing that you've been provided detailed descriptions for are those three job descriptions that you actually signed off on in Exhibit Number 4. Is that - -

A      Yes.

Upon further questioning by counsel for the claimant, Dr. Martin further explained:

Q      Okay. Apparently, in reviewing the documents which are Exhibit Number 4, they do state that "Production standards will not be enforced until the training program has been completed," which, I understand, was a ten-month program. So, in other words, he didn't have to produce anything more than he felt like producing. That was your understanding?

A      Yes.

. . . .

Q      Was that a consideration, Doctor, in your signing off on the job, that he did not have to make a production standard?

8

A        I didn't know that he had a standard amount that he had to produce.

Q        Okay.

A        I'm not sure how that would be - - or how much it would be.

. . . .

Q        So would your opinion change if he were forced to meet a production standard, or could it change.

A        It could change.

When asked in his deposition about whether he continued to feel that the claimant could perform the job descriptions[5] he approved with WE, he explained that he felt

---

[5]The Job Analysis Form submitted to the physicians for their approval includes descriptions for the positions of "Bath Salt Cup, Bottle and Pouch Assembler, Homebound," "Confetti Cup + Bag Assembler, Homebound," and "Item Cutter (Scissors), Homebound." For illustration purposes, the Job Analysis form for the "Confetti Cup & Bag Assembler, Homebound," provides, in part:

**Job Description:** The employee will make cups of confetti using nylon netting squares (tulle) and small plastic champagne cups or bags of confetti using small plastic bags.

**Confetti cups** - The employee will spread a small towel onto a work surface of his or her choosing and then place one empty champagne cup on the center of the towel. The employee will then use a small measuring cup to scoop confetti out of a small container and carefully pour it into the empty champagne cup to the proper level. The employee will then place a nylon netting square on top of the filled cup. The nylon netting will be gathered tightly around the stem of the champagne cup and secured with a strip of pre-cut ribbon, which will be tied in a bow. The confetti cup will then be inspected by the employee so that its appearance and condition meet the employer's quality standards. The finished cup will be placed into a box. Once the box is filled with 16 confetti cups, its cover will be replaced and the box placed to the side. The employee will telephone the courier to schedule a pick up of the completed boxes. When the courier arrives, the employee will submit a packing slip (that the employee fills out and signs) to document transfer of the boxes.

**Confetti bags** - The employee will spread a small towel onto a work surface of his or her choosing and then place one empty plastic bag on the enter of the towel. The employee will then use a small measuring cup to scoop confetti out of a small container and carefully pour it into the empty plastic bag until a predetermined weight is reached. The plastic bag will be secured with a label and staples. The confetti bag will then be inspected by the employee so that its appearance and condition meet the employer's quality standards. The finished bag will be placed into a box. Once the box is filled with confetti bags, the box will be placed to the side. The employee will telephone the courier to schedule a pick up of the box. When the courier arrives, the employee will submit a packing slip (that the employee fills out and signs) to document transfer of the box.

9

the claimant would be able to do so from a pain management standpoint.

The claimant's treating psychiatrist, Dr. Blackburn explained in his deposition that although he approved the positions offered, he had since become reluctant to approve positions with WE due to problems other patients had experienced with those positions. With regard to the claimant's ability to work in general, Dr. Blackburn testified:

Q       Would it be a job that would be something that, for instance, he wouldn't have to make determinations as to how he does a job, something that's kind of structured so he doesn't have to make decisions himself?

A       Yeah. I don't think he's - - in spite of his improvement academically, I don't think he's capable of making good decisions. I don't believe, for example, that if, in fact, it happened that he would benefit at all from going to a three-week course on how to manage a business at home because he's not able to put together the kind of thinking that's necessary to do that. Maybe with the aid of his wife, they might do some home work business, but my impression of Dallas is functioning in the workplace he's going to need somebody to supervise him or somebody to lay the job out and say this is what it's going to be. He has had the ongoing illusion or fantasy that he'll become so

---

The employee is expected to interact with fellow employees and management with a cheerful, pleasant, and positive attitude.

**Job Modification Options/Comments:** The employee may self regulate the amount of time spent doing work activities at one time or during the day. This allows for the employee to stretch, move about, lie down, take meal breaks or work breaks at own discretion. The employer will make every effort to accommodate the needs of an individual employee based on physical limitations or restrictions. The production standards will not be enforced until the training program has been completed. **Note: This paragraph may be modified in order to include modifications or accommodations specific to an employee's unique physical limitation or restrictions.**

**Estimated Physical Requirements:**
Sitting: At one time: 15-20 minutes          Total during day: 5-6 hours
Standing: At one time: NR                    Total during day: NR
Walking: At one time: NR                     Total during day: NR
Note: The employee can stand or walk if he or she desires to be comfortable and may self regulate the amount of time spent doing a work activity at one time or during the day.
Lifting: Maximum Pounds - Frequently 0-2 pounds Occasionally: up to 10 pounds
Carrying: Maximum Pounds - Frequently 0-2 pounds Occasionally: up to 10 pounds

> computer literate and accomplished that he'll just do some
> marketable process with the computer at home. I have no reason
> to believe that's even vaguely like that.

Although the workers' compensation judge was aware of the physicians' approval, the record also supplies evidence of the claimant's impaired condition and difficulty in undertaking work generally. While the positions were initially approved, the workers' compensation judge was not required to find that the offered positions are reflective of a claimant's ability to perform work. The record also offers evidence indicating that the position offered is not reflective of positions available in the job market.

Stanford McNabb of WE stated that "[t]he primary function and mission of Work Enterprises is to provide re-training and re-employment to the population of people who are not otherwise served." He explained during the initial ten-month training period the employee is guaranteed that they will not be laid off and will be paid $5.15 per hour for up to thirty hours per week. This is true, even though there are no set production standards for an individual during this training period. Rather, due to ADA guidelines, the production standards during the training period are tailored to participants' abilities. According to Jack Arceneaux, former State Director for WE, no participant was ever terminated due to an inability to meet these adjusted production standards during the training period. However, according to Mr. McNabb, the worker may later be fired for not working up to his or her capability. The evidence indicates that, even with a claimant's disabilities, the job and associated production standards would be tailored to fit that individual, at least during the initial ten-month training period. Except for very limited circumstances would the approach ever exclude anyone from returning to work at a position like the one offered.

11

The record also reflects that the program is a subsidized one in that the profits from products manufactured and sold by the company are insufficient to make the business profitable. Mr. McNabb explained at the hearing that the business is marketed to insurance companies with a focus on the savings available to these companies through use of the program.[6] For those companies interested in using the companies for their disabled employees, a series of payments is due. According to Jack Arceneaux, a former State Director with WE, the payment schedule required of the employer/insurer for each employee of WE is as follows: $3,000 for initial involvement and preparation/presentation of job analyses; $3,000 after approval of the job analyses by the employee's physician; $3,000 thirty days after the employee accepts the offer and commences work; $3,000 sixty days after the employee commences work; and, finally, $1,000 ninety days after the employee commences work. According to Larry Foreman, an adjuster for Gray Insurance Company, $6,000 was paid to WE for the time period up to the offer that was ultimately rejected by Mr. Maynard.

Without commenting on whether the program offered to Mr. Maynard would constitute adequate *rehabilitation*, a question not before the court, we find no manifest error in the conclusion that the offered positions were not "employment" within the terms of La.R.S. 23:1221. Although the employer contends that, in *Kaiser v. Western-Southern Ins. Co.*, 01-1393 (La.App. 5 Cir. 5/15/02), 821 So.2d 52, the

---

[6]In Mr. McNabb's testimony he explained that:

[O]ne of the benefits to the program is that everyone who's involved in the program benefits. For example, the injured worker, if he comes to work for us, ends up making Fifty-one Dollars and Forty-four Cents more per week than he would just strictly on workers' comp. The insurance carrier ends up paying less money over a long time in disability benefits. Our society benefits, because we have - - we are creating productive people who become tax payers. So, it's a situation where everyone wins.

fifth circuit found employment offered by WE meets the statutory definition of employment, we do not find the case instructive in the instant matter. Rather, in *Kaiser*, the fifth circuit reviewed a workers' compensation judge's conclusion that the claimant was not in fact permanently totally disabled. The applicable deferential standards of review were described by the court throughout the opinion. In the present case, we are reviewing a workers' compensation judge's determination to the contrary, *i.e.*, that Mr. Maynard is totally disabled. Furthermore, in *Kaiser*, although a WE position was offered, so were several other, sedentary positions. Finally, there were varying physicians' opinions as to whether the claimant in *Kaiser* could return to work. In the present case, we have no such indication from the physicians. To the contrary, the treating physicians were specific that the claimant's ability to work is extremely limited and that it will continue to be in the future.

In short, the record supports a finding that the offered position is not reflective of a claimant's ability to engage in employment. Thus, we find no manifest error in the workers' compensation judge's determination to return the claimant to full benefits.

*Rehabilitation*

Next, the employer questions the workers' compensation judge's conclusion that vocational rehabilitation efforts expended prior to the arrangement with WE were inadequate under La.R.S. 23:1226. In ruling, the workers' compensation judge concluded that the efforts of the vocational rehabilitation counselor were limited to making contact with WE.

Louisiana Revised Statutes 23:1226 provides, in part:

A. When an employee has suffered an injury covered by this Chapter which precludes the employee from earning wages equal to

13

wages earned prior to the injury, the employee shall be entitled to prompt rehabilitation services.

B.      (1) The goal of rehabilitation services is to return a disabled worker to work, with a minimum of retraining, as soon as possible after an injury occurs. The first appropriate option among the following must be chosen for the worker:

(a) Return to the same position.
(b) Return to a modified position.
(c) Return to a related occupation suited to the claimant's education and marketable skills.
(d) On-the-job training.
(e) Short-term retraining program (less than twenty-six weeks).
(f) Long-term retraining program (more than twenty-six weeks but not more than one year).
(g) Self-employment.

(2) Whenever possible, employment in a worker's local job pool must be considered and selected prior to consideration of employment in a worker's statewide job pool.

(3)(a) The employer shall be responsible for the selection of a vocational counselor to evaluate and assist the employee in his job placement or vocational training . . . .

In the present case, the workers' compensation insurer contacted Jody Dupre' a vocational rehabilitation consultant. Ms. Dupre' explained in her deposition that she did not provide vocational rehabilitation to Mr. Maynard, but "was providing limited services per request of the carrier[,]" who she identified as Larry Foreman of Gray Insurance. Ms. Dupre' stated that she was asked to "contact Mr. Maynard and meet with him. I was also asked to contact Mr. Jack Arceneaux of Work Enterprises and obtain some job analyses to be presented to both doctors, Dr. John Martin and Dr. James Blackburn." She denied being contracted to provide any further services. The remainder of her deposition testimony confirms that these were the only actions she completed with regard to Mr. Maynard's file. Finally, Mr. Maynard's testimony regarding his contact with Ms. Dupre' is not clear, but confirms the limited nature of

their relationship.

Given evidence of her limited services, it is apparent that opportunities for a return to some type of position and the availability of those positions, as envisioned by the preferential listing of La.R.S. 23:1226, were not explored in sufficient fashion to satisfy the burden placed upon the employer in this case.

*Penalties and Attorney's Fees*

Finally, the employer contests the imposition of penalties and attorney's fees in this matter. Without addressing the specific basis for each of the three separate $2,000 penalties, the employer contends that generally the matter was sufficiently contested so as not to warrant penalties and attorney's fees.

At the time of the alleged violations at issue, La.R.S. 23:1201 provided, in part:

> A. Payments of compensation under this Chapter shall be paid as near as may be possible, at the same time and place as wages were payable to the employee before the accident; however, when the employee is not living at the place where the wages were paid, or is absent therefrom, such payments shall be made by mail, upon the employee giving to the employer a sufficient mailing address. However, a longer interval, not to exceed one month, may be substituted by agreement without approval of the director. An interval of more than one month must be approved by the director.

> B. The first installment of compensation payable for temporary total disability, permanent total disability, or death shall become due on the fourteenth day after the employer or insurer has knowledge of the injury or death on which date all such compensation then due shall be paid.

> . . . .

> E. Medical benefits payable under this Chapter shall be paid within sixty days after the employer or insurer receives written notice thereof.

> F. Failure to provide payment in accordance with this Section shall result in the assessment of a penalty in an amount equal to twelve percent of any unpaid compensation or medical benefits or fifty dollars per calendar day, whichever is greater, for each day in which any and all

15

compensation or medical benefits remain unpaid, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim . . . .

The workers' compensation judge awarded three separate penalties of $2,000 each. First, penalties were awarded to provide medical benefits in that a discogram recommended by Mr. Maynard's orthopedic surgeon was denied. At the hearing, Mr. Foreman, the insurance claims adjuster, testified simply that the discogram procedure was regularly denied by the agency. In his deposition, Mr. Foreman denied having obtained a second opinion as to the necessity of the discogram requested by the orthopedic surgeon. In finding a penalty appropriate, the workers' compensation judge observed that no evidence was offered as to the allegedly controversial nature of the procedure. We find no abuse of discretion in the workers' compensation judge's award of penalties in this regard.

Next, the workers' compensation judge awarded $2,000 for failure to appropriately calculate Mr. Maynard's average weekly wage. Testimony in the record indicates that at the time the wage was calculated, it excluded certain fringe benefits, including health insurance benefits provided to Mr. Maynard's family. We observe that the employer did not raise on appeal issues related to the recalculation of the average weekly wage, a final determination. As the workers' compensation payments made to Mr. Maynard did not include the benefits found appropriate by the workers' compensation judge, the $2,000 penalty was not an abuse of discretion.

Finally, a $2,000 penalty was awarded for failure to reimburse Mr. Maynard for several prescription medications purchased in 2001. Although the receipts from the purchases were entered into evidence, there is no corresponding evidence in the payment history indicating that the sums were reimbursed. Again, we find no abuse

16

of discretion in the award of penalties in this regard.

Turning to the issue of attorney's fees, reference to La.R.S. 23:1201(F) indicates the availability of attorney's fees for failure to pay claims due under La.R.S. 23:1201(A)-(E). In this regard, the workers' compensation judge awarded $12,000 in attorney's fees to Mr. Maynard's counsel.[7] The employer questions the award, stating that such a fee is inappropriate given the contested and ongoing disputes involved in this matter. Importantly, we note that the penalties and attorney's fees awarded were not related to the central issue of whether benefits were appropriately reduced. Rather, the penalties were awarded for the above violations. Again, the record reveals no abuse of discretion in the award of those penalties. Accordingly, the determination to award the attorney's fee in this regard was not an abuse of discretion.

*Claimant's Answer*

The claimant has answered the appeal, seeking additional attorney's fees for work performed on appeal. We find such an award required under the circumstances and in light of La.R.S. 23:1201(F). Having considered these proceedings, along with

---

[7]The workers' compensation judge referenced the failure to provide appropriate vocational rehabilitation as a possible basis for awarding attorney's fees. Although the supreme court has found attorney's fees appropriate in cases involving an improper *discontinuation* of vocational rehabilitation, *see Haynes v. Williams Fence and Aluminum*, 02-442 (La. 4/21/03), 851 So.2d 917 (wherein the supreme court explained that vocational rehabilitation is a "claim due" under then existing La.R.S. 23:1201.2), the supreme court subsequently found that an award of penalties or attorney's fees for failure to *provide* rehabilitation is not available under La.R.S. 23:1201(F). *See Chelette v. Riverwood Intern. USA, Inc.*, 03-1483 (La. 10/17/03), 858 So.2d 412.

Note, however, that subsequent to *Chelette*, La.R.S. 23:1201.2 was repealed pursuant to 2003 La.Acts No. 1204, § 2. Pursuant to the same Act, La.R.S. 23:1201 was amended to provide for penalties and attorney's fees for failure to pay "claims due." The subsequent amendment is inapplicable to the present case, however, as the law in effect at the time of the violation is the law applicable to the issue of penalties and attorney's fees. *See Skipper v. Acadian Oaks Hosp.*, 00-67 (La.App. 3 Cir. 5/3/00), 762 So.2d 122. Thus, although we have concluded that the award of attorney's fees for violations of La.R.S. 23:1201 was not an abuse of discretion, the failure to provide appropriate rehabilitation is not one of those which we have considered to be a suitable basis for the award.

17

the claimant's brief filed with this court, we award an additional $3,000 for attorney's fees on appeal.

DECREE

For the foregoing reasons, the decision of the Office of Workers' Compensation is affirmed.  Additional attorney's fees in the amount of $3,000 are awarded for work performed on appeal.  All costs of this matter are assigned to the appellants, Grey Wolf Drilling and The Gray Insurance Company.

**AFFIRMED.  ADDITIONAL ATTORNEY'S FEES AWARDED.**