JOAN BERNARD ARMSTRONG, Chief Judge.
| )Brand Services, Inc. (Brand) appeals from a judgment of the Office of Workers’ Compensation, District 8, for the Parish of Orleans. The hearing officer found that the claimant, Leandez McGee, suffered a work-related injury on April 15, 2008, while in the course and scope of his employment by Brand as a scaffold carpenter. Mr. McGee was awarded ongoing medical care necessary and related to the accident in conformity with La. R.S. 28:1203(A) and the guidelines established in the Louisiana Worker’s Compensation Act (LWCA), including lumbar ESIs, facet injections, lumbar CT scan and MMPI. He was awarded Temporary Total Disability (TTD) benefits from April 15, 2008 at the rate of $522.00 per week. The hearing officer found that Brand failed reasonably to controvert Mr. McGee’s claim, and awarded the following penalties:
$2,000.00 for Brand’s failure to pay timely the Radiology Group’s bill dated May 12, 2008;
$2,000.00 for Brand’s failure to institute and timely pay TTD benefits pursuant to La. R.S. 23:1201(F) and the LWCA;
12$2,000.00 for Brand’s failure to authorize timely medical treatment ordered by Dr. Warren Bourgeois, pursuant to La. R.S. 23:1201(F);
$2,000.00 for Brand’s failure to authorize timely treatment by Mr. McGee’s choice of orthopedic surgeon, pursuant to La. R.S. 23:1201(F).
Mr. McGee was also awarded attorney’s fees in the amount of $7,500.00 and all costs of the proceedings. The hearing officer awarded interest on the judgment as provided by law.
ASSIGNMENTS OF ERROR
Brand assigns three errors, contending that (1) the hearing officer applied an inappropriate legal standard to Mr. McGee’s claim of TTD; (2) the hearing officer applied an inappropriate standard of proof to the issue of whether Brand timely approved Mr. McGee’s treatment by Dr. Bourgeois; and (3) the hearing officer’s conclusion that Brand did not reasonably controvert Mr. McGee’s claims is manifestly erroneous.
STANDARDS OF REVIEW
The legal claims set forth in the first two assignments of error are reviewed de novo, and the hearing officer’s factual conclusion concerning Brand’s reasonableness, vel non, in handling the claims is reviewed under the manifest error standard of review. Williams v. Children’s Hospital, 07-0464, p. 2 (La.App. 4 Cir. 1/23/08), 996 So.2d 291, 293, citing Seal v. Gaylord Container Corp., 97-0688, p. 4 (La.12/2/97), 704 So.2d 1161, 1164; Booker v. International Rivercenter, 04-1980 (La.App. 4 Cir. 6/22/05), 905 So.2d 498.
Where legal errors have tainted the fact finding process, the verdict below is not reviewed under the manifest error standard and, if the record is complete, the appellate court may make a de novo review of the record and determine the merits | sof the case, applying the burden of proof appropriate thereto. See, Rosell v. ESCO, 549 So.2d 840, 844 fn. 2; Gonzales v. Xerox Corp., 254 La. 182, 320 So.2d 163 (1975).
APPLICABLE LEGAL PRINCIPLES
The controlling law applicable to this case is found in sub-parts A and B of Part II of the LWCA. In sub-part A, “General Provisions”, La. R.S. 23:1201 provides for the time and place of payment of compensation benefits, the consequences of an employer’s failure to pay and authorize timely, and for penalties and attorney fees. Sub-part B, “Disability Provisions”, provides in La. R.S. 23:1221(1) for compensa *1168 tion for an employee’s TTD, including a definition of TTD[1] and imposing the clear and convincing burden of proof on the employee. Clearly, these provisions are to be read in pari materia.
The judgment does not specifically advert to the TTD standards of proof set forth in La. R.S. 23:1221(1). The record contains neither written nor oral reasons for judgment. Based on the record before this Court, we are unable to determine if the hearing officer applied the clear and convincing burden of proof to the evidence presented at the hearing. The judgment is silent as to the burden of proof |4and TTD standard applied, and we are, therefore, compelled to review the case de novo.
EVIDENCE ADDUCED AT TRIAL
Mr. McGee testified at the hearing that he graduated from Booker T. Washington High School in 1989. Upon graduation he entered the workforce, working offshore with Universal Catering for three years and subsequently as a laborer for Murphy Oil and Mobil Oil for several years. He then obtained training and certification as a pipefitter and worked in that capacity for Boh Brothers for ten years. He then performed a scaffolding job, for which he did not receive any special training, and then worked for BellSouth. He worked for an unidentified company and then for two years offshore for Gulf South Scaffold Company as a carpenter, for which he received on-the-job training. He and his brother, Eugene McGee, then sought and obtained a job around 2007 on land with Brand. They worked for Brand out of Morgan City for five or six months, commuting from New Orleans, whereupon they obtained transfers to the Conoco Phillips Oil Refinery in 2008. Mr. McGee worked with his brother and the other members of his crew, Raul[2], James, and Pablo[3] at the time of his accident on April 15, 2008. He served as a carpenter, his brother was the lead hand, Pablo was a helper and James was a ground man. Kevin Hunter was in charge of Mr. McGee’s crew and another crew. Mr. McGee’s crew worked four ten-hour shifts, from 6:30 to 5 Mondays through Thursdays. He sometimes worked overtime by staying longer, for which he was compensated at a higher rate for those hours in excess of forty hours per week. He received bonus checks weekly provided the crew members did not have any ^injuries *1169 or miss a day during that week. Prior to his accident, neither he nor any other member of his crew were injured on the job, and he received a bonus check every week.
Mr. McGee’s starting hourly rate was $16.01. The weekly bonus was $115.20. This pay scale was in effect on March 30, 2008. Prior to the accident, his hourly rate was increased to $18.89 and the bonus was eliminated. Mr. McGee testified that, when employed by Brand, he made himself available for a full forty-hour week each week, was a full-time employee, but did not receive health care benefits or health insurance.
Mr. McGee testified that on April 15, 2008, he and his crew were working in a heating unit at the Conoco Phillips site, with Mr. Hunter as the foreman. Mr. McGee was in the back of the unit, building a scaffold, with a man identified as Lionel, with the last of the tow boards being used in the process. Raul was in the front pulling on a gate on which he had set a ladder; however, Raul had not secured the ladder bracket, causing the ladder to have no support. Mr. McGee got on the ladder, climbed up about twenty-five feet, and when he put his second D-ring to the ladder, it bent and he fell backward twenty-five feet. His back and left side hit first, and Mr. Hunter caught his head. Then Mr. McGee bounced over and hit the scaffold with the right side of his body. Mr. Hunter’s leg was broken in his attempt to catch Mr. McGee. Within a few days of the accident, the entire crew was laid off or fired at Conoco’s request.
Mr. McGee testified that his right ankle was badly sprained, his left ankle was fractured, he had a bad clot on the side of his thigh, his back was injured, and the ladder hit his neck and cut his nose, requiring stitches. Eugene, James, Pablo and Raul witnessed the accident, with Raul having seen everything, but, Mr. | fiMcGee testified, no one tried to warn him. An ambulance took him to Ochsner Hospital where he was examined and given medication. The Ochsner Medical Center report indicates that Mr. McGee received a prescription for Flexoril, 10 mg three times daily, and Percocet every four hours as needed. He was then taken back to his mother’s home, where he was living, to recover. He remained at his mother’s home on April 16 and 17.
According to Mr. McGee, on April 18, two of Brand’s “safety guys”, one of whom was named Jose, took him and his mother to see Lisa Hawk, M.D. Dr. Hawk noted that Mr. McGee’s ankle was fractured, a fact not noticed at the hospital. He was complaining at the time of pain in his ankles, low back, and right hip, and of the bruise to his thigh. Dr. Hawk examined him, obtained an x-ray of his ankle, prescribed Oxycodone and Flexoril, and provided Mr. McGee with a new set of crutches. Mr. McGee had never taken these medications prior to his accident. Dr. Hawk told him not to drink or drive, and advised him to rest and elevate his leg. The Brand employees returned Mr. McGee and his mother to her home.
According to a Work Status Report of Dr. Hawk’s examination dated April 18, 2008, Mr. McGee had the following capabilities: 100% sitting and grasp/pinch; 50% reach above shoulder; 25% walking, standing, and reach beyond forearm limits; and no capability to bend, squat, twist, crawl, climb, or work on heights. His work status was listed as “may work with restrictions or modifications.”
Mr. McGee testified that on April 22, 2008, one of the Brand employees, Jose, again took him to see Dr. Hawk. She did not discuss his returning to work at that time, and he was still on crutches. Jose stayed with Mr. McGee during the *1170 17examination, but did not discuss returning to work or have any conversation with Dr. Hawk in Mr. McGee’s presence.
According to a Work Status Report of Dr. Hawk’s examination dated April 22, 2008, Mr. McGee had negligible (ten pounds maximum) lift and push capability, eliciting a work level of “sedentary”. He had the following capabilities: 100%: sitting, grasp and pinch; 25% walking or standing; no capability to bend, squat, twist, crawl, climb, work on heights, reach above shoulder, or reach beyond forearm limits. Again, his work status was noted as “may work with restrictions or modifications.” His follow up indicates he was not discharged from care, was to have a return appointment in four to five days, and was referred to physical therapy for evaluation and treatment.
Mr. McGee denied knowledge of the fact that Dr. Hawk had released him to light duty after the initial visit and after the April 22, 2008 visit. He also testified that his medications caused him to lose his memory “in a way”. He had no clear recollection of having undergone an MRI examination, although the medical records evidence such an exam.
According to the report of Thompson M. Dietz, M.D., of Clearview Medical Imaging, dated April 22, 2008 and directed to Dr. Hawk, findings of the MRI of the left thigh were consistent with a significant lateral aspect left thigh muscle contusion involving the vastus lateralis and, less prominently, subjacent vastus intermedius muscles. That MRI indicated overlying broad-based deep subcutaneous elliptical fluid collection consistent with seroma/he-matoma measuring up to 16 cm in length, 11 cm in AP dimension and 2 to 8 cm depth. Furthermore, the left femur appeared intact with a normal, uniform pattern of marrow space signal intensity. The record also contains Dr. Dietz’ report of the |SMRI of Mr. McGee’s hips, with attention to the left side. The report indicated no abnormalities of the joints and no evidence of occult osseous injury, fracture, contusion, or joint effusion. Dr. Dietz reported that an MRI of Mr. McGee’s lumbar spine showed slight lumbar curvature, but otherwise normal alignment and no evidence of spondylolysis or spondylolis-thesis. There was no evidence of occult osseous injury in the lumbar region. The report noted congenital or developmental relative narrowing of the lumbar spinal canal and superimposed mild degenerative changes at L3-4, L4-5 levels, with mild-moderate lower lumbar foraminal narrowing, most prominent at the L5-S1, L4-5 levels.
The record contains a copy of a letter from Casey Dufour, Brand’s Divisional Safety Manager for the New Orleans area, to Mr. McGee dated May 2, 2008. The letter advises Mr. McGee that he had been released to work with restrictions, enclosing the associated paperwork. The letter advised Mr. McGee to report to Brand’s hiring center on Airline Highway in St. Rose, Louisiana for assignment, and provided Mr. Dufour’s contact information. The record contains an unopened certified mail envelope from Brand addressed to Mr. McGee at his address, marked “notified 5-8-09”, “Final Notice”, and “unclaimed.” Mr. McGee and his mother denied having received notice of this mailing. Mr. McGee testified that he did not have any knowledge of a purported job offer from Brand in the weeks following the accident. As of May 2, 2008, he was still on crutches and taking Flexoril and Hy-drocodone, and opined that he would not have been able to work with Brand in any position. Mr. McGee denied having received a job offer either directly from Brand or through his counsel following the accident.
*1171 |gOn May 12, 2008, Mr. McGee went to Touro Infirmary’s emergency room with the same back complaints. He testified that he was not scheduled to see Dr. Hawk after the April 22, 2008 appointment, and had not heard further from the Brand safety employees[4]. The Touro doctor examined him, recommended therapy and gave him a prescription for Oxycodone and Flexoril. The emergency room report indicates a prescription for Toridal and Flex-oril. He also received an injection of Tori-dal, and a recommendation that he see a specialist. He remained on crutches from six to eight weeks.
A report of the Touro Department of Radiology from a radiological examination of Mr. McGee’s lumbar spine, dated May 12, 2008, indicates normal alignment and curvature without fracture or subluxation or degenerative changes. The impression given was “normal examination.” The Department’s examination of Mr. McGee’s sacrum also showed no fracture, lytic or blastic changes, and was given a “normal examination” impression. There is no evidence that Mr. McGee sought further treatment during the ensuing four and a half months.
On October 3, 2008, he saw Warren R. Bourgeois, III, M.D., of Audubon Orthopedics and Sports Medicine, complaining of right hip pain. Dr. Bourgeois ordered an MRI of his lower back and left thigh and recommended physical therapy and a blanket MRI. Based on Dr. Bourgeois’ referral, Mr. McGee attended a therapy session with Joseph Shine, Jr., P. T., at the Louisiana State University Medical Center. Mr. McGee testified that the result of that session was that he was in pain and could not move for a while. He discussed the therapy with Dr. 1 inBourgeois, who advised him to discontinue the physical therapy. Dr. Bourgeois gave him prescriptions for pain, and recommended epidural steroid injections (ESI) which Brand denied. Mr. McGee’s testimony that Brand denied the ESIs appears to be based on the results of his independent medical examination by orthopedist Robert A. Steiner, M.D. On March 10, 2009, Dr. Steiner reported to Angela Klemenakis of Broadspire, the firm handling Mr. McGee’s compensation claim on Brand’s behalf, that although Dr. Bourgeois had recommended ESIs and facet blocks for pain management, he disagreed. Dr. Steiner opined, “It is unlikely that facet injections and epidural steroid injections would be helpful for this patient in light of the fact that he is displaying pain-type behavior and there was lack of effort during physical therapy testing. I would not send this patient for ESI or facet injections. He may continue working as a material inspector[5].”
The record contains physical therapist Shine’s initial evaluation, dated November 13, 2008. Mr. Shine concluded that Mr. McGee had had a significant fall and has findings consistent with lumbar and right hip strain, but his high subjective complaint of pain and uncharacteristic movements with simple tasks such as active and passive motion, light palpation, and general mat mobility “is odd considering the injury occurred 7 months ago. No significant muscular or neurological findings were noted.” Mr. Shine recommended a treatment plan in which Mr. McGee would be seen three times a week for four weeks *1172 for lumbar and right hip stabilization exercises, a general conditioning program, stretching, and posture awareness. His goals were to improve pain free lumbar range of motion by lnfifty percent, decrease pain complaints by fifty percent, increase tolerance to physical activity, perform a brief lift test, and ultimately progress to an independent home program.
The record contains a report from Mr. Shine co-signed by Jennifer Culotta, S.P. T., dated November 19, 2008. According to that report, prepared by the physical therapy service to which Mr. McGee’s chosen physician referred him, Mr. McGee continued to report pain with exercise, claiming that he could walk only four to five blocks before his back would hurt. Upon resting, his back stiffened. The technicians reported that Mr. McGee presented to them with an antalgic gait pattern, claiming his back was burning. He denied any radiating pain down his posterior thigh and said he could not walk on the treadmill and refused to pedal the bike a second time. He required increased rest breaks between exercises, secondary to a subjective claim of pain. The technicians noted that Mr. McGee was able to walk between the exercises with minimal antalgic gait, and was observed walking across to the parking garage after the therapy session “without any gait deviation.” The plan at that time was to continue to monitor Mr. McGee’s claims of pain with exercise and gauge his full effort. He was to be given a questionnaire and pain diagram on his next visit, and was given hamstring stretches to perform at home.
By letter of November 25, 2008, Mr. Shine reported to Dr. Bourgeois that he had evaluated Mr. McGee for his complaint of low back pain on November 13th and had seen him again on November 19th; however, Mr. McGee had missed four appointments as of the date of the letter. The letter concludes, “Based on the inconsistent signs during his initial evaluation, his inconsistent attendance in physical therapy and the lack of any significant medical findings, I would like to 112recommend doing an FCE with Mr. McGee to get a feel for his functional abilities on returning back to the work force in general.”
Mr. McGee testified that Dr. Bourgeois placed him on no work status and continues to treat him for the results of the fall. Dr. Bourgeois also recommended psychological counseling to deal with Mr. McGee’s accident-related depression, anxiety, and sad feelings. Mr. McGee testified that he had not experienced these symptoms prior to the accident and understands that Dr. Bourgeois continues to recommend psychological counseling.
The record contains a report from William Romani, M.C., of Diagnostic Imaging Services of an MRI of Mr. McGee’s right hip, provided at the request of Dr. Bourgeois. The doctor’s impression was of a small focus of hyperintense signal at the muscle tendon unit of the right gluteus medius that was felt to reflect a strain of the gluteus medius muscle tendon complex. There was no evidence of bone pathology or muscular abnormality. Dr. Ro-mani noted the presence of mild arthritic changes affecting the bilateral hips, being more pronounced toward the left.
Mr. McGee testified that Brand referred him to their physician, Dr. Steiner, of Drs. Nutik & Steiner, APMC, specialists in Orthopedic Surgery, whom he saw initially on December 2, 2008. He complained to Dr. Steiner of daily lower back and right hip pain that caused him to be unable to walk more than five or six blocks without pain and required him to sit down. Mr. McGee testified that Dr. Steiner did not tell him that he could go back to work, and did not recall Dr. Steiner’s recommendations.
*1173 Dr. Steiner’s report to Ms. Angela Klemenakis of Broadspire reflects the result of his independent medical examination of Mr. McGee in December, 2008. |1S The report notes Mr. McGee’s subjective complaints of daily, recurrent low back and right hip pain. The report indicates that Mr. McGee told him he had had only one physical therapy treatment and has been out of medication for about two weeks. The examination revealed no lower extremity weakness and no sensory deficit to light touch. Mr. McGee’s reflexes at his knees and ankles were symmetrical and straight leg raise on the right in sitting and supine positions caused him to complain of a tight sensation in the right hip, but no radiating pain. Left leg raises were negative. Dr. Steiner noted that Mr. McGee’s right leg appeared to be longer than his left leg. Dr. Steiner took X-rays that showed no abnormalities of the hips and sacroiliac joints and no degenerative changes or fractures or areas of bony destruction. The report also notes the generally insignificant results of the MRIs taken on April 22, 2008 and of October 24, 2008. Dr. Steiner concluded that his findings suggested right sacroiliac dysfunction consistent with the mechanism of Mr. McGee’s fall from the scaffold. Dr. Steiner recommended sacroiliac mobilization and stabilization specific physical therapy. In the meantime, he placed him at a sedentary physical demand level where “he may work as long as he does not have to do prolonged standing and walking. He should not do any bending, stooping, twisting or lifting activities at this point in time.” He believed treatment should last for about six weeks following mobilization of Mr. McGee’s sacroiliac joint to a normal position.
Mr. McGee testified that in January he was referred to physical therapy, but the weather had changed and he was in so much pain he could not complete the therapy. He did not discuss this therapy with Dr. Bourgeois. He admitted that he received a job offer from Brand in January for some sort of light duty as a Material Inspector; however, he claimed “My doctors, they had me on no work status.” | u This is consistent with Dr. Bourgeois’ reports to Broadspire dated October 8, 2008, October 31, 2008, December 2, 2008 in which he indicates that Mr. McGee is not able to return to work. However, there is no indication that this opinion referred to all types of work as contemplated in the LWCA provisions relating to TTD.
Following Dr. Steiner’s medical examination on December 2, 2008, Mary Anne Lansden, R.M., B.S.N, Mr. McGee’s medical case manager at Broadspire, wrote to Dr. Steiner on January 7, 2009, enclosing a copy of the modified job as Material Inspector developed by Brand in accordance with the restrictions outlined by Dr. Steiner in his initial report. Dr. Steiner signed off on the letter, indicating that he reviewed the requirements of the job of Material Inspector and approved it for Mr. McGee. The record contains a copy of a letter dated January 19, 2009 from Casey Dufour, employee health services manager for Brand’s New Orleans area, offering Mr. McGee a position as a material inspector on Airline Highway in St. Rose, Louisiana, beginning on January 26, 2009 with weekly hours Monday through Friday from 7 a.m. to 3:30 p.m., and wages of $17.63 per hour. The letter indicated that the physical requirements of the position had been approved by the doctor, and that Mr. McGee would be assigned only to tasks consistent with his physical abilities, skills, and knowledge. Mr. Dufour wrote that as Mr. McGee continued to progress toward complete recovery, Brand would work with the physician either to modify the position or create another light-duty position commensurate with the level of his *1174 recovery. The job offer was stated to be open for five work days from Mr. McGee’s receipt of the letter.
At the hearing, Mr. McGee denied having received the letter at his home or having been notified of the letter by his attorney, and denied having been aware of the letter. However, he testified earlier that he had discussed the job offer with Dr. | ^Bourgeois, who, he claims, suggested he remain on no work status. His mother, Lily McGee Hall, also contradicted his denial of having received the letter. She testified that she saw the letter, and questioned at the time what “light duty” consisted of, if her son’s doctor was saying he was unable to work. She testified that he opens his own mail.
Mr. McGee testified that at the time of the hearing, he was still having severe back pain, depression, anxiety, and trouble sleeping and walking six to seven or eight blocks. He denied any continuing problems with his nose, neck, right thigh, or bruised thigh. When asked if he could perform the duty of sorting one-pound scaffold clamps while seated, he answered, “Probably, probably not, I don’t know. I know my back would allow me to do very little.” He admitted having seen the January 19, 2009 letter outlining his modified duty job offer, and that he had never shown the material to Dr. Bourgeois.
Thé record contains a copy of Dr. Steiner’s letter of June 9, 2009 to Ms. Kleme-nakis, noting that Mr. McGee continues to report recurrent low back pain, tingling and burning sensation in his legs with prolonged walking. Dr. Steiner notes no antalgic component to Mr. McGee’s gait, and that he was able to stand without scoliosis or list. Pinching of the skin and pseudorotation tests were positive for lower back pain. Lower extremity motor, sensory and deep tendon reflex exams were normal, as were sitting and supine straight leg raise tests. Dr. Steiner found no evidence of nerve root impingement, nerve root irritation, or neurologic deficit in the lumbar region. He recommended continued conservative management with the use of anti-inflammatory medications and the discontinuation of narcotic analgesics. Dr. Steiner concluded, “I do not see a | ^medical contraindication for this patient working, but he should avoid heavy labor.”
According to Mr. McGee, Brand has not provided him with a weekly benefits check or any money in the form of an indemnity check, although Brand did reimburse him for his first two prescriptions. On cross-examination, he admitted that the workers’ compensation carrier reimbursed him for $312.01 for prescriptions on November 20, 2008, and that he had not submitted the remainder of his $469.47 Walgreen’s bill to Brand for payment. Although he had testified that Touro was billing him for $712.48 for emergency room services, he admitted he had not been advised that this bill was paid on November 10, 2008. He admitted on cross-examination that he did not have to pay out of pocket for any medical treatment other than these pharmacy charges, which either were paid or not submitted for payment.
In June of 2008, he sought approval from Brand to see neurologist Daniel Tra-hant, M.D., neurosurgeon Rand Voorhies, M.D., and a psychiatrist, but Brand has not authorized him to do so. Mr. McGee denied having any secretarial or computer skills, and his job history reflects that he has never held an office or other indoor job. He testified that he last saw Dr. Bourgeois within a month of the hearing, and that the doctor recommended a CT scan of the lumbar spine, which Brand did not approve, and continued his placement on a no work status. The record contains a report dated January 20, 2009 from ra *1175 diologist Jash Patel, M.D., of Doctors Imaging Services, recommending a CT scan to better evaluate the diameters of Mr. McGee’s spinal canal in the lower lumbar region. The record also contains a copy of a letter dated March 25, 2009 from defense counsel to Mr. McGee’s attorney advising that Brand approved the CT scan recommended by Dr. 117Bourgeois, asking that the facility coordinate the procedure through Ms. Angela Klemenakis of Broad-spire. Dr. Patel’s recommendation contained in his January 20, 2009 report to Dr. Bourgeois, was faxed to Brand’s counsel by transmission dated February 12, 2009, 2:45 p.m. Brand approved the CT scan recommendation and communicated its approval to Mr. McGee’s attorney by the letter dated March 25, 2009. It appears that no further action was taken by Mr. McGee or his attorneys to arrange for the CT scan.
Mr. McGee admitted on cross-examination that despite the series of examinations and three MRIs, the cause of his pain remains of unknown origin. On re-direct examination, he denied any discussions with Dr. Bourgeois of possible herniations in his back. When questioned about Dr. Hawk’s recommendation that he see ISR Physical Therapy, he admitted that a Brand employee was willing to pick him up and take him to therapy the first time. He agreed to go on the eighteenth and twenty-second of April, 2008, but claimed that after that time, the Brand employees did not contact him. Mr. McGee denied that the employees were told he would not agree to further physical therapy, although his mother testified that she sent the employees away when they came to take her son to therapy.
Mr. McGee admitted that his physician, Dr. Bourgeois, had referred him to the LSU physical therapist, Mr. Shine, for physical therapy, and denied that he had ever walked normally after the accident. He denied any knowledge of the appointments scheduled with Mr. Shine for November 24, 26, and December 3, 2008. He admitted that Dr. Steiner recommended physical therapy at Baudry Physical Therapy, that he attended one therapy session and did not continue to |18pursue the recommended therapy. Mr. McGee denied that he was faking his symptoms. However, the Baudry report dated January 28, 2009, indicates:
“No obvious myotomal weakness noted, but effort was lacking with testing. Movement testing: pain reported with all trunk and left ROM (range of motion) tested. Movement appeared self-limited. Gait: exaggerated limp with decreased weight bearing. Waddell’s testing: pain reported with simulated trunk rotation and simulated compression.
The assessment of Mr. McGee was inconclusive secondary to high pain complaints with all movement testing, and self-limited behavior. Patient was resistant to passive ROM testing, SLR, SI testing, and any other manual testing. We would be willing to work with Mr. McGee if desired, to work on conditioning and strengthening, but an improved level of effort would be required to have any success.”
Kevin Hunter, the foreman on the job at the time of the accident, testified at the hearing. After the accident in which Mr. McGee fell on Mr. Hunter, breaking Mr. Hunter’s leg, he returned to light duty work at Brand’s main office, sitting separating clamps and ladder brackets, and using a cane to assist him in walking. The work involved separating the good and bad clamps into separate baskets while seated, bending and a little stooping. He walked about one hundred feet from his car to his job. He initially worked from two to four *1176 hour shifts, and believed he was still in a cast or boot when he returned to work. He worked in this light duty position for about a month and then returned to full duty.
Mr. Dufour, Brand’s safety manager, also testified at the hearing. He became involved in this case on April 22, 2008, when he took Mr. McGee to see Dr. Hawk at Pelican. No other Brand employee was with them at that time. The previous week, Craig Castillo and Jose Selvino, who work for Mr. Dufour, took Mr. McGee to Dr. Hawk and arranged for a follow-up visit on April 22. At that |19visit, Dr. Hawk sent him with Mr. McGee to have an MRI of Mr. McGee’s hip. He did so, and returned with Mr. McGee to Dr. Hawk’s office. She then explained that the MRI revealed nothing negative, and the hip injury was nothing more than a bruise on his leg. Dr. Hawk advised him that Mr. McGee could return to sedentary duty. After the accident, Mr. McGee was paid on the days he visited the doctor with the Brand employees.
Upon Dr. Hawk’s order of physical therapy for Mr. McGee, Mr. Dufour arranged for therapy with ISR. When he went to Mr. McGee’s home to pick him up for the therapy appointment, Mrs. Hall told him that Mr. McGee would no longer be going to Brand’s doctor. She provided no further explanation.
According to Mr. Dufour, the intention of Brand’s light duty program is to get an injured employee back to work. In his experience, returning to work usually aids in the healing process and gets them back to full duty more quickly, as was the case with Kevin Hunter.
Mr. Dufour identified his letter of May 2, 2008 offering Mr. McGee light duty work. He sent the letter by certified mail, but received the unopened envelope from the postal service with the indication that the postman had made a final attempt but the envelope was unclaimed. Mr. Dufour testified that he never received any contact from Mr. McGee or his attorneys since that time about a return to work.
Mr. Dufour identified his letter of January 19, 2009 offering Mr. McGee the light duty position of materials inspector. This offer was made based on Dr. Steiner’s report indicating that Mr. McGee was able to perform light duty, sedentary work. The letter also offered to make additional accommodations based upon restrictions provided by a doctor. Mr. Dufour testified that Mr. McGee didj^not reply to this letter, and that he has not received any communication from Mr. McGee or his representatives concerning his return to work.
BURDEN OF PROOF
In Buxton v. Iowa Police Department, 09-0520, p. 21 (La.10/20/09), 23 So.3d 275, 288-89, the Louisiana Supreme Court held:
A workers’ compensation claimant seeking temporary ... total disability benefits bears the burden of proving by clear and convincing evidence, his inability to engage in any type of employment. [Citation omitted] This burden of proof is statutorily mandated [citing La. R.S. 23:1221(l)(a) and (c) ].
Thus, to be entitled to TTD benefits a claimant must present clear and convincing evidence that he is unable to work at any type of employment whatsoever because of his physical condition; the fact that he would be working in pain is not proof that he is totally disabled.
Ultimately, the court found that the hearing officer’s decision to award TTD benefits was based on one statement by the examining physician that the claimant needed “time to recover”. As such, the court held, “Clearly, this was not clear and *1177 convincing evidence of total disability,” and found the award of TTD benefits to have been manifestly erroneous. Buxton at p. 23, 28 So.3d at 289-90.
This Court held in Jackson v. Sysco Food Services, 05-1304, p. 1-2 (La.App. 4 Cir. 6/7/06), 934 So.2d 191, 193 that, in determining whether a claimant has met his burden of proving by clear and convincing evidence his entitlement to TTD benefits, the hearing officer must weigh both medical and lay evidence. Furthermore, the claimant must introduce objective medical evidence to sustain his claim by clear and convincing evidence. Id.
Mr. McGee’s treating physician was not called, and his reports do not offer clear and convincing evidence that his patient is incapable of performing any work |g1at all or, specifically, the offered job of material inspector. The only evidence specifically addressing the issue of whether or not Mr. McGee is able to perform the work of a material inspector offered him by Brand is his testimony, “Probably, probably not. I don’t know.” Dr. Steiner initialed his approval of the material inspector job offer, indicating that Mr. McGee was capable of performing the duties associated with that position. The physical therapists chosen by both Dr. Bourgeois and by Dr. Steiner noted Mr. McGee’s lack of cooperation in his treatment, and noted inconsistencies in his presentation.
CONCLUSION
The legislature, in La. R.S. 23:1221(l)(c), set a very strict and high standard for the award of benefits for TTD, a standard that does not allow exceptions for odd-lot employment, sheltered employment, or employment while working in any degree of pain. When reviewed in its entirety, we are compelled to find that the evidence in this record falls far short of the “clear and convincing evidence” of Mr. McGee’s inability to perform any work at all, whether or not in odd-lot jobs, sheltered employment, or any degree of pain, as required by the statute. In light of our conclusion that entitlement to TTD benefits was not proven by clear and convincing evidence, we pretermit review of the hearing officer’s imposition of statutory penalties and attorney fees.
We therefore are mandated to vacate the judgment of the Office of Workers’ Compensation and to dismiss the claimant’s claim for temporary total disability, penalties, and attorney fees and remand for consideration of any other benefits to which Mr. McGee may be entitled under the LWCA.
VACATED, SET ASIDE AND REMANDED.
LOVE, J., dissents with reasons.

.La. R.S. 23:1221 provides in relevant part: "Compensation shall be paid under this Chapter in accordance with the following schedule of payments: (1) Temporary total, (a) For any injury producing temporary total disability of an employee to engage in any self-employment or occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured, and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, or experience, sixty-six and two-thirds percent of wages during the period of such disability, (b) ... compensation for temporary disability shall not be awarded if the employee is engaged in any employment or self-employment regardless of the nature or character of the employment or self-employment including, but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain, (c) ... compensation for [TTD] shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.”

. Raul spoke no English, and Mr. McGee spoke no Spanish.

. Pablo spoke very little English.

. His mother admitted at the hearing that when the Brand employee came to her home to take Mr. McGee to his follow-up appointment, she told them he would no longer participate in the physical therapy.

. Brand had offered Mr. McGee light duty work as a material inspector. Apparently, Dr. Steiner understood at the time of his report that Mr. McGee had accepted the offer, although that was not the case.