PAUL A. BONIN, Judge.
|, Terry Russell, a longtime employee of the Sewage & Water Board of New Orleans, was disabled as a result of an on-the-job injury. The Sewage & Water Board paid him temporary and total disability benefits.- When his treating physician, Dr. Bruce Torrance, determined that Mr. Russell had reached maximum medical improvement, the Sewage & Water Board *95 began a process to offer alternative emr ployment to Mr. Russell in order to accommodate his disability. .
Contending that Mr. Russell rejected alternative employment that would have equaled his pre-injury salary, the "Sewage & Water Board terminated indemnity benefits to Mr. Russell. Mr. Russell then filed a claim with the Office of Workers’ Compensation by which he sought supplemental earnings benefits, known as SEBs, as well as statutory penalties and attorney fees. At the conclusion of the trial, the judge in the Office of Workers’ Compensation found that Mr. Russell had refused an offer of employment which would have resulted in no diminution of his pre-injury earnings and thus denied him SEBs. The OWCJ, also, denied penalties and attorney fees and dismissed Mr. Russell’s case with prejudice. |aMr. Russell appeals the denial of any supplemental earnings benefits as well as the denial of the penalties and attorney fees.
We convened a five-judge panel to consider Mr. Russell’s appeal. See La. Const, art. 5, § 8(B).[1] Employing the “manifest error” standard, we have reviewed the principal factual finding by the OWCJ that Mr. Russell was capable of working an accommodated eight-hour per day schedule such that his refusal of any shch employment offered by the Sewage & Water Board precludes an award of SEBs. We find that the OWCJ was clearly wrong in finding that Dr. Torrance had medically cleared Mr. Russell for working eight hours per day, even in an accommodated employment because, as all witnesses to the point agreed, Dr. Torrance had cleared Mr. Russell for a maximum of four hours per day.
And because compensating Mr. Russell, an hourly wage earner, for only four hours per day would result in his earning less than 90% of his pre-injury1 wages, we conclude that Mr. Russell is entitled to supplemental earnings benefits and, accordingly, reverse the judgment insofar as it denied such benefits. We remand this matter for a calculation of those benefits. On remand, the OWCJ shall also reconsider the issue of statutory penalties and attorney fees, which we do not reach on this appeal.
We explain our decision in more detail below.

Jd

We begin by emphasizing that the OWCJ correctly found, and the Sewage & Water Board agrees, that Mr. Russell is presumed. entitled to supplemental earnings benefits because his disability arises from an on-the-job injury and he was unable to earn ninety percent of his pre-injury wages. See La. R.S. 23:1221(3)(a)(i).[2] See also Winford v. *96 Conerly Corp., 04-1278, p. 16 (La.3/11/05), 897 So.2d 560, 570. But, if the Sewage & Water Board proves that Mr. Russell, despite not actually being engaged in any employment or self-employment, rejected work or employment “which he was offered or tendered by the employer” and, importantly for our purposes, “which he was physically able to perform,” then the wages he would have earned in such employment are imputed to him for the purposes of calculating his' post-injury earnings. La, R.S. 23:1221(3)(e)(i).[3] See, e.g., Noto v. City of New Orleans Fire Department, 04-0472, pp. 5-6. (La.App. 4 Cir. 9/1/04), 883 So.2d 439, 443-444.
It was stipulated that, at the time of his accident, Mr. Russell’s average weekly wage was $1,168.81. According to the formula established by Section 1221 (3)(a)(i), *97 Mr. Russell’s average monthly wage at the time of his accident was | ,4⅞064.84.[4] And there is no question that an eight-hour per day employment of Mr. Russell at his pre-injury rate of pay would result in his ineligibility for SEBs.
*96 [[Image here]]
*97 Thus, we focus first on the evidence relied upon by the OWCJ in making the factual finding that Mr. Russell was “physically able to perform” the eight-hour employment tendered to him.
A
Mr. Russell suffered a work-related injury while opening a manhole cover on October 29, 2009. The accident caused thrombosis, i.e., blood clotting, in Mr. Russell’s left upper arm and was later found to have caused “thoracic outlet syndrome,” which resulted in a compressed subclavian vein. That is, the accident injured a vein in Mr. Russell’s upper chest. In order to repair the injury, Mr. Russell consented to undergo several successive surgeries and procedures.
Mr. Russell first underwent a thrombec-tomy and balloon angioplasty with'subcla-vian stent placement on October 31, 2009. The stent, however, became obstructed by a blood clot, which, according to Dr. Torrance, “was unable to be recanalized.” Subsequently, on June 2, 2010, one of Mr. Russell’s ribs was removed to correct the thoracic outlet syndrome and the collapsed subclavian vein stint.
According to Dr. Torrance, however, Mr. Russell “subsequently has had problems since then, worsening over the past six months with continued venous hypertension in left arm and pain and discomfort with any movement.” Dr. | ¿Torrance then ordered a venogram of Mr. Russell. Because the venogram could not be completed due to an impassable blockage, Mr. Russell underwent a left internal jugular vein to cephalic vein bypass by way of a saphenous vein graft on January 11, 2012. Mr. Russell “tolerated that procedure well,” but continued to suffer from edema. In order to reduce the edema, Dr. Torrance, on March 2, 2012, performed a ligation of the surgically created arteriovenous fistula that he had installed during the bypass surgery. The procedure was uneventful and Mr. Russell was able to return home later that day.
Dr. Torrance subsequently concluded in April of 2012 that Mr. Russell had reached maximum medical improvement and cleared him to return to work.
B
As a result of the doctor’s medical clearance for Mr. Russell’s return to work, Janice McAbee, a registered nurse whose employer, Corvel Corporation, contracts with the Sewerage & Water Board for case management services, was detailed to Mr, Russell’s case. She testified that on April 19, 2012, she and Mr. Russell met with Dr. Torrance at his medical office. She stated that Dr. Torrance informed her that Mr. Russell had reached maximum medical improvement, and released him to sedentary work with the following restrictions: “Dr. Torrance stated Mr, Russell cannot use his left arm at all, and he has a five pound weight lifting limit. I asked if this was permanent, and he stated the restrictions were permanent.”
|7Ms. McAbee then turned over the management of Mr. Russell’s case to Heyward Johnson. Mr. Johnson, it was stipulated, is an expert in the field of vocational rehabilitation. Mr. Johnson then interviewed Mr. Russell and his wife and later asked *98 Dr. Torrance to specify or detail Mr. Russell’s work restrictions.
As the management of Mr. Russell’s case progressed, Mr. Johnson ■ came to learn that a mail courier position was open at the Sewage & Water Board. The corresponding job description defined the position accordingly:
This position requires the courier to go to various departments and offices located at the Peoples Street Office (Central Yard) to collect mail, documents, contracts, etc. The collected items are transported by driving a company truck to the St. Joseph’s Street and/or Algiers offices and dispersing them to the designated departments or offices. The ability to read and follow simple instructions is required. A valid driver’s license is required. The unauthorized transporting of anyone or items is unwarranted. The courier is responsible for conducting daily safety checks of the truck before operating. Any vehicle concerns are reported to the supervisor and the garage. Attention to dress codes, proper identification, safe truck operation, securing of collected items and exhibiting courteous demeanor is expected.
The listing also set out the job’s physical demands:
This, position should be classified as Light Duty per the following physical demands. Light duty has a maximum lifting of twenty pounds according to the U.S. Department of Labor. The courier is required to drive their personal vehicle to the People St. location to clock in for duty and pickup [sic ] the truck keys. The collection of items to be transported requires the walking to offices within each building that may involve multiple floors. Elevators and/or stairs can be used to access offices. All collected items are carried in a shoulder bag. The amount of items carried in the bag , can be managed by the courier. The truck can be used at the People St. (Central Yard) location. This routine is • . performed approximately four times a day. Time management is the responsibility of the courier with respect to breaks, lunch and delivery to sites.
Mr. Johnson then re-contacted Dr. Torrance in the hope of securing the doctor’s approval for placement of Mr. Russell in the mail courier position. | ^Responding on August 2, 2012, Dr. Torrance disapproved Mr. Russell for the position, noting that Mr. Russell was not to engage in constant neck turning, or heavy lifting and reaching with his left arm.
Persisting, Mr.-Johnson was at first able to change Dr. Torrance’s mind after finding a mailbag for Mr. Russell that would not impinge upon his left shoulder. Even in approving of the placement in his note of August 23, 2012, Dr. Torrance, insisted, however, that' Mr. Russell should not engage in any lifting or strenuous activity with his left arm. He also indicated that Mr. Russell was not to engage in any constant neck turning, but noted that he could work four to eight hours to increase to eight hours as tolerated.
Importantly, however, in a separate response to Mr. Johnson’s request for an estimation of Mr. Russell’s functional capacities — also dated August 23, 2012 — Dr. Torrance indicated that Mr. Russell could not work for more than four hours per day and he. reiterated the prior restrictions.
' Mr. Johnson testified that he then contacted Mr. Russell and informed him that Dr. Torrance had approved him' for the mail courier position. It does not appear that Mr. Johnson discussed the nature of Dr. Torrance’s job restrictions or rate of pay with Mr. Russell.
For reasons not at all explained in the record,. Dr. Torrance again changed his *99 mind on September 20, 2012, and withdrew his approval for the job and again reiterated his restrictions. After further discussions with Mr. Johnson, Dr. Torrance again changed his mind the next day and approved the job with | flrestrictioris. Notably, there is no indication in the record whether Mr. Russell was kept apprised of these twists and turns in Mr. Johnson’s’ conversations with Dr. Torrance, or, if he was, when he was informed that he was, or was not, cleared to work as a mail courier.
Mr. Johnson opined at trial that Mr. Russell was physically; capable of performing the duties of the mail carrier job as approved by Dr. Torrance. But, on cross-examination, Mr. Johnson acknowledged that the mail courier position entailed a full eight hours of work. More importantly, Mr. Johnson, who had the most interaction and discussion with Dr. Torrance; clearly understood, and so testified, that Dr. Torrance maintained the four-hour workday restriction for as long' as Mr. Johnson himself was assigned to Mr. Russell’s case.
When confronted with this seeming contradiction, Mr. Johnson stated: “The job was appropriate as far as it respected the gentleman’s functional ability. Now, as far as whether or not the Sewerage & Water Board wanted him to work part-time or eight hours, that’s something they would have to deal with.”
That Dr. Torrance had restricted Mr. Russell to working only four hours was corroborated by the Sewerage & Water Board’s Worker’s Compensation Coordinator, Linda Paisant. She too testified that “[t]he doctor only approved four hours for him to work.” And, in light of Dr. Torrance’s restriction on the number of hours that he could work, she stated ■ that. the Sewerage & Water Board devised a plan to accommodate Mr. Russell: “So we had planned to allow him- to work the four hours and accommodate him through SEB for the other four hours to give him | infull payment.” She explained that this was the plan “[bjecause Mr. Russell was an exemplary employee of Sewerage and Water Board, and had worked for 25 — 27 years. So we didn’t want to see him terminate his employment.”
As the Sewage & Water Board’s eomp coordinator, she then directed Mr. Johnson to set up an interview for Mr. Russell with Terrence Wills. Mr. Wills oversees the mail courier position. He confirmed in his testimony that he was contacted by Mr. Johnson who sought employment on Mr. Russell’s behalf as the mail courier. Mr. Wills, however, testified repeatedly to being unclear about the nature of the mail courier position. For example, Mr. Wills could not say how many hours per day that Mr. Russell would be required to work or even if he discussed such details with Mr. Russell.
Mr. Wills also testified that while the mail courier position was an hourly position, the actual pay rate is keyed to the employee’s prior “salary”:
It’s paid based — it’s really paid based on the individual’s salary coming into that position. If you work in, say, networks, and for whatever reason something happens and now you’re in a light duty position, you come to our department. Whatever you were — your salary was in that position in networks, that’s the salary. you’re going to keep even With this light duty position.[5]
*100 |„Mr. Wills further testified that the mail courier position would require Mr. Russell to clock in and out every day, and that the job entailed collecting and delivering the mail at specified times throughout the day. And, while Mr. Wills thought that Mr. Russell could leave work after he finished his last mail run, he admitted that he did not know the designated collection/delivery times.
Mr. Wills, nevertheless, testified that he eventually spoke with Mr. Russell about the job. According to Mr. Wills, Mr. Russell declined the job offer: “When I spoke with him, it was more on the lines of he presented it in a way as if he hadn’t been cleared or that position wasn’t cleared by the doctor, I believe. And I spoke with Mr. Johnson about it, and he said that it was cleared. So, initially, presented that it was something that he wanted but couldn’t get. But then it later came out that he outright refused — didn’t want the job.” Mr. Wills did not say whether he, or someone else from Support Services, spoke to Mr. Russell again after speaking with Mr. Johnson.
Significantly, Mr. Russell’s recollection of the events corresponds with Mr. Wills’ testimony. Mr. Russell first testified that he spoke with Dr. Torrance about the mail courier position before speaking with Mr. Wills and, as a result, was under the impression that he “wasn’t capable of doing it.” He noted that this conversation with Mr. Wills was the only conversation he had with anyone from the Sewerage and Water Board about the mail courier position. Mr. Russell testified that he had no further conversations about the mail courier position with Sewerage & Water Board employees.
|12At that point in time, Mr. Russell received a termination of benefits letter on December 5, 2012. Ms. Paisant explained that the Sewerage and Water Board terminated Mr. Russell’s benefits because he refused the mail courier position after interviewing with Mr. Wills. Mr. Russell subsequently elected to retire from the Sewerage & Water Board effective March 1,2013.
C
Dr. Torrance, as we have noted, did not testify at the trial or by deposition. But all medical records were admitted into evidence by stipulation. We have examined those records and nowhere in them is there any notation that Mr. Russell was able to work more than four hours per day. The sole written notation that even approaches such an assertion is Dr. Torrance’s “comments” of August 23, 2012, in which, while approving the mail courier job description and physical demands, reiterates physical restrictions and suggest that Mr. Russell might be able to work up to eight hours as tolerated. And even those comments must be understood in the context of Dr. Torrance’s discussions with Mr. Johnson, the Sewage & Water Board’s vocational rehabilitation expert.
II
Notwithstanding the foregoing evidence, the OWCJ found that Dr. Torrance, on September 21, 2012, eliminated “any requirement that Mr. Russell restrict his *101 work hours,” and, based upon that finding of fact, concluded that the Sewerage & Water Board successfully established that Mr. Russell was capable, but unwilling, to return to full employment at his same rate of pay.
11sWe, of course, review that factual finding under the “manifest error” standard: See Phillips v. City of New Orleans (NOPD), 12-1684, p. 16 (La.App. 4 Cir: 6/1/13) 116 So.3d 823, 830. In applying the manifest error-clearly wrong standard, we must determine whether the conclusions of the fact-finder, here the OWCJ, are reasonable, not whether she was right or wrong. See Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840, pp. 7-8 (La.7/1/97) 696 So.2d 651, 556.
We cannot conclude that a fact-finder’s choice between two views of the evidence is manifestly erroneous or clearly wrong so long as there are two permissible views of the evidence. See Seal v. Gaylord Container Corp., 97-0688, p. 5 (La.12/2/97), 704 So.2d 1161, 1164. And, in order to determine whether a view of the evidence is permissible and reasonable, we review the record in its entirety. See Winford, 04-1278, pp. 15-16, 897 So.2d at 569-570.
In assessing whether the OWCJ’s view of the evidence was a permissible view, we start with the well-established general rule that the fact-finder should give, greater weight to the view of the treating physician than to that of a physician who treated the patient only once or twice. See McCorkle v. Management Services USA 12-1609, p. 7 (La.App, 4 Cir. 4/24/13), 113 So.3d 516, 520. Here, of course, the Sewage & Water Board has not offered evidence that Dr. Torrance, the primary treating physician, categorically concluded, as the OWCJ found, that Mr. Russell was capable of working eight-hour days. To the contrary, Mr. Johnson, especially, who had the most direct contact of any witness save perhaps Mr. | uRussell himself, clearly understood that Dr. Torrance had not cleared Mr. Russell for .an eight-hour day; the most he had been cleared for was a four-hour day. This appreciation of Dr. Torrance’s view was. confirmed by Ms. Paisant, the comp coordinator for the Sewage & Water Board. She never testified that she understood that Mr. Russell had ■been approved for an eight-hour day at the time she was seeking an accommodation in employment to be offered to- him. ■ And, notably, Mr. Wills, the supervisor for the mail couriers, expressed his clear appreciation that Mr. Russell was not able to physically work an eight-hour d'ay. Also, we cannot overlook the testimony of Mr. Russell himself; he did not believe that he had been cleared for an eight-hour workday. There simply is no testimony from which the OWCJ could find that Dr. Torrance had removed the restriction of a four-hour maximum workday for Mr. Russell.
And, importantly, we cannot ascribe to a view that the single written notation by Dr. Torrance commenting on the speculative possibility that Mr. Russell may one day be able to tolerate an eight-hour workday so “contradicts” the consistent testimony of all the witnesses that it alone could render their testimony undeserving of credibility. Cf. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). It seems, moreover, that the OWCJ only found “evi-dentiary” support in her conclusion not based upon any actual written note by Dr. Torrance but rather upon her observation that his September 21, 2012 written comments on the mail courier position do not mention a time restriction. Perhaps such an inference might be reasonable in the absence of other evidence. And that | ^evidence, without contradiction, shows that Dr. Torrance restricted Mr. Russell to *102 working no more than four hours per day and that this restriction was never lifted.
Accordingly, we conclude that the OWCJ’s view of the evidence - (that Mr. Russell was released by Dr. Torrance to work ah eight-hour day) is not a permissible view of the evidence based upon the .entire record and is unreasonable. And because the denial of SEBs was premised upon this impermissible view of the evidence, we must reverse the judgment insofar as it denied supplemental earnings benefits to Mr. Russell.
Ill
The only permissible view of the evidence is that Mr. Russell was able to physically perform the duties of a mail courier with restrictions at the Sewage & Water Board and that he rejected even such part-time work.[6] Because there was part-time work offered to Mr. Russell that he was physically able to do,[7] the Sewage & Water Board is entitled here to reduce the, amount .of his weekly.,supplemental earnings benefit but not to restrict or eliminate. an .award of SEBs. See Noto, 04-0472, pp. 5-6, 883 So.2d at 443-444.
1fiWe will remand to the Office of Workers’ Compensation to calculate the reduction .or credit to which the Sewage & Water Board is entitled under La. R.S. 23:1221(3)(c)(l). Such payments, which are to be paid monthly, shall be “equal to sixty-six and two-thirds percent of the difference between the average monthly ■wages at time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment.” La. R.S. 23:1221(3)(a)(i). Accordingly, an employee’s “[ajverage monthly wages shall be computed by multiplying his wages by fifty-two and then dividing the product by twelve.” If, as here, the employee is not engaged in any employment or self-employment, the amount determined to be the wages the employee is able to earn in any month “shall in no case be less than the sum the employee would have earned in any employment ... which he was physically able to perform, and (1) which he was offered or tendered by the employer or any other employer ...” La. R.S. 23:1221(3)(c)(i). That is, the amount of an award of SEBs is based upon the difference between the claimant’s pre-injury average monthly wage and the claimant’s proven post-injury monthly earning capacity. See Seal, 97-0688, p. 8, 704 So.2d at 1166.
It appears to us, given what we understand is Mr. Russell’s hourly rate of pay, the post-injury four hour per day mail courier job would have resulted in earnings of $445.20 per week. In light of the formula set out in Section 1221(3)(a)(i), $445.210 times fifty-two divided by twelve comes to an average monthly wage of $1,929.20. The parties stipulated that Mr. Russell’s average 117weekly wage prior to his injury was $1,168.81, which, again according to the formula set out in Section *103 1221CB) (a) (i), equates to an average monthly wage of $5,064.84. The difference between $5,064.84 and $1,929.20 equals a monthly.wage loss .of $8,135.64. SEBs would, therefore, be owed because the part-time job identified at trial by the Sewerage & Water Board would only have paid approximately thirty-eight percent of Mr. Russell’s pre-injury average monthly wage.
Here, based upon Mr. Russell’s .pre-inju-ry average monthly wage of $5,064.84, the OWCJ shall precisely calculate Mr. Russell’s hourly rate of pay, multiply it by 86.66 hours,[8] and subtract the product from the pre-injury average monthly wage. Then, in accord with La. R.S. 23:1221(3)(a)(i), the OWCJ shah award sixty-six and two-thirds percent of the difference as the appropriate SEB, payable monthly. . .
In making an award of the reduced SEBs, the OWCJ shall commence the payments effective December 5,2012, the date benefits had been terminated. The reduced SEBs shall be paid to Mr. Russell one hundred four weeks after the date of termination.[9] See, e.g., Kinchen v. City of Shreveport, 46,490, p. 10 (La.App. 2 Cir. 9/21/11), 73 So.3d 1011, 1018.

JlF

Mr. Russell also assigned as error the denial by the OWCJ of his claim for statutory penalties and attorney’s fees. The workers’ compensation statutory scheme does provide for the award of penalties and attorney fees under certain circumstances. S.ee La. R.S. 23:1201 F. The OWCJ necessarily concluded that penalties and attorney fees would not be imposed because in prevailing before her on the principal issue the Sewage & Water Board had “reasonably controverted” the claim. La. R.S. 23:1201 F(2).
In light of our remand to award the appropriate supplemental. earnings benefits to Mr. Russell, we will pretermit addressing this assignment of error and entrust the reconsideration of the appropriateness of penalties and attorney fees in this case to the OWCJ on remand.
REMAND INSTRUCTIONS
Accordingly, we remand this matter to the Office of Workers’ Compensation for the OWCJ to precisely calculate the supplemental earnings benefits due Mr. Russell under La, R.S. 23:1221(3), consider his claims for penalties and attorney’s fees, and to render an appropriate judgment.
DECREE
We reverse the judgment in favor of the Sewerage & Water Board of New Orleans and against Terry Russell, which dismissed his workers’ compensation claims with prejudice. We render judgment in his favor and against the Sewerage & Water Board, decreeing that he is entitled to supplemental earnings benefits. ■ |iaWe remand the matter to the Office of. Workers’ Compensation for further proceedings in accord with our remand instructions. The costs of this appeal are .taxed to the Sew *104 age & Water Board. See La. C.C.P. art. 2164.
REVERSED AND REMANDED
LOVE, J., dissents and assigns reasons.
BELSOME, J., dissents with reasons.

. This provision reads:
(B) Judgments. A majority Of the judges sitting in a case shall concur to render judgment. However, in civil matters only,-when a judgment of a district court or an administrative agency determination in a workers’ compensation claim is to' be modified or reversed and one judge dissents, the case shall be- rear-gued before a panel of at least five judges prior to rendition of judgment, and a majority shall concur to render judgment, (emphasis added)

. La. R.S. 23:1221 reads in pertinent parts:
Compensation shall be paid under this Chapter in accordance with the following schedule of payments:
[[Image here]]
(3) Supplemental earnings benefits.
(a)(i) For injury resulting in the employee’s inability to earn wages equal to ninety percent or more of wages at time of-injury, supplemental earnings benefits, payable monthly, equal to sixty-six and two-thirds percent of the difference between the average monthly wages at time of injury, and average monthly wages earned or average monthly wages the employee is able to earn in any month there *96 after in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience, such comparison to be made on a monthly basis. Average monthly wages shall be computed by multiplying his wages by fifty-two and then dividing the product by twelve.
(ii) When the employee is entitled to monthly supplemental earnings benefits pursuant to this Subsection, but is not receiving any income from employment or self-employment and the employer has not established earning capacity pursuant to R.S. 23:1226, payments of supplemental earning benefits shall be made in the manner provided for in R.S. 23:1201 (A)(1).
(b) For purposes of Subparagraph (3)(a), of this Paragraph, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sums actually received by the employee, including, but not limited to, earnings from odd-lot employment, sheltered employment, and employment while working in any pain.
(c)(i) Notwithstanding the provisions of Subparagraph (b) of this Paragraph, for purposes of Subparagraph (a) of this Paragraph, if the employee is not engaged in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, or is earning wages less than the employee is able to earn, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sum the employee would have earned in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, which he was physically able to perform, and (1) which he was offered or tendered by the employer or any other employer, or (2) which is proven available to the employee in the employee’s or employer’s community or reasonable geographic region.
(ii) For purposes of Subsubparagraph (i) of this Subparagraph, if the employee establishes by clear and convincing evidence, unaided by any presumption of disability, that solely as a consequence of substantial pain, the employee cannot perform employment offered, tendered, or otherwise proven to be available to him, the employee shall be deemed incapable of performing such employment.
(d)The right to supplemental earnings benefits pursuant to this Paragraph shall in no event exceed a maximum of five hundred twenty weeks, but shall terminate:
(i) As of the end of any two-year period commencing after termination of temporary total disability, unless during such two-year period supplemental earnings benefits have been payable during at least thirteen consecutive weeks; or
(ii) After receipt of a maximum of five hundred twenty weeks of benefits, provided that for any week during which the employee is paid any compensation under this Paragraph, the employer shall be entitled to a reduction of one full week of compensation against the maximum number of weeks for which compensation is payable under this Paragraph; however, for any week during which the employee is paid no supplemental earnings benefits, the employer shall not be entitled to a reduction against the maximum number of weeks payable under this Paragraph; or
(iii) When the employee retires; however, the period during which supplemental earnings benefits may be payable shall not be less than one hundred four weeks.

. See n. 2, ante.

. Section 1221(3)(a)(i) indicates that an employee’s average monthly wage is calculated by multiplying the average weekly wage times fifty-two and dividing by twelve.

. We appreciate Mr. Wills' testimony on this point only to mean that Mr. Russell would be allowed to maintain the same hourly rate of pay that he earned pre-injury. We cannot understand Mr. Wills’ testimony to mean that an employee working for a public, employer such gs the Sewage & Water Board could be paid for eight hours of work even if only *100 actually working four hours. See La. R.S. 14:138 A(2) (“Public payroll fraud is committed when ... [a]ny public officer or public employee shall carry, cause to be carried, or permit to be carried, directly or indirectly, upon the employment list or payroll of his office, 'the name of any person as employee, or shall pay any employee, with knowledge that such employee is receiving payment or compensation for services not actually rendered by said employee or for services grossly inadequate for such payment or compensation.”).

. We parenthetically note that we even considered the possibility that the OWCJ had decided this matter on the basis that the rejection of any work, part-time or fulltime, by Mr. Russell would render him ineligible for supplemental' employment benefits. We would have- reviewed the legal correctness of such a decision de novo. See Augusta v. Audubon Zoo, 15-0300, p. 3 (La.App, 4 Cir. 09/23/15), 176 So.3d 616, 617-618. But at oral argument counsel for both parties assured us that the OWCJ had not committed such legal error.

. By seeking SEBs, which is a method of replacement of lost wages for partially disabled employees, see Allen v. City of Shreveport, 618 So.2d 386, 388 (La.1993), Mr. Russell acknowledges that he is not totally • disabled from gainful employment.

. This is derived by calculating four hours per day (the amount of time he is physically able to work as a mail courier) times five days per week times 52 weeks in the year divided by twelve (for months in the year).

. Ordinarily, supplemental earnings benefits terminate upon the retirement of the worker. Mr. Russell retired on March 1, 2013. But retirement notwithstanding, "the period during which supplemental earnings benefits may be .payable shall not be less than one hundred four weeks.” La. R.S. " 23:1221(3)(d)(iii).